**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| W. LOWELL STARLING AND NANCY STARLING, | : | No. 30 MAP 2016 |
| | : | |
| | : | Appeal from the Order of the Superior |
| Appellees | : | Court at No. 1779 MDA 2014 dated |
| | : | August 11, 2015, Reconsideration |
| | : | Denied October 14, 2015, Reversing |
| v. | : | and Remanding the Order of the Adams |
| | : | County Court of Common Pleas, Civil |
| | : | Division, at No. 2010-S-498 dated |
| LAKE MEADE PROPERTY OWNERS | : | September 26, 2014. |
| ASSOCIATION, INC., | : | |
| | : | ARGUED: September 14, 2016 |
| Appellant | : | |

**OPINION**

**JUSTICE WECHT** **DECIDED: May 25, 2017**

In Pennsylvania, planned communities are sufficiently common that twenty years ago our General Assembly adopted a uniform act regulating aspects of their inception, organization, and management.[1] This case involves a dispute in one such community between property owners and their governing homeowners association. At issue is the ownership and use of certain undesignated property and the road that runs the length of a peninsula jutting into Lake Meade, the man-made lake at the heart of the community. We granted review in order to consider ownership and permissible uses of the road and the adjacent strip of undesignated, undeveloped property.

---

[1] *See* Uniform Planned Community Act, Act of Dec. 19, 1996, P.L. 1336, No. 180, 68 Pa.C.S. §§ 5101, *et seq.*

## I.    Background

Because this case reaches us following the Superior Court's reversal of the trial court's order granting summary judgment in favor of the Lake Meade Property Owners Association, Inc. ("the Association"), the following account of the facts is as alleged by homeowners W. Lowell and Nancy Starling ("the Starlings"), the non-moving parties relative to that determination, with all inferences drawn in their favor.[2]  Thus, we begin with the facts as alleged in the Starlings' operative Second Amended Complaint ("the Complaint") and their answer and brief in opposition to the Association's motion for partial summary judgment.

The Lake Meade Subdivision ("the Subdivision"), originally purchased, subdivided, and developed by Lake Meade Incorporated ("LMI"), is a gated community comprised of more than 1,000 residential units surrounding Lake Meade in Adams County.  The Association was incorporated on June 25, 1966.  LMI recorded the Subdivision Plan ("the Plan") in the Office of the Recorder of Deeds of Adams County on January 20, 1967.[3]  The Dedication describing the Plan provided that the "[p]rimary purpose of this plan is for the enjoyment of out of door recreation and will so provide for the owners of lots purchased a healthful atmosphere for themselves, their children and friends."  *See* Association's Motion for Partial Summary Judgment, Exh. E ("Dedication").

By deed dated May 16, 1967, LMI transferred title in separate deeds to Lots 725 and 726 (collectively, "the Starling Tract") to W.F.O. Rosenmiller, III, and Elinor T.

---

[2]    We review the record in the light most favorable to the nonmoving party, and we resolve all doubts as to the existence of a genuine dispute regarding a material fact against the moving party.  *Gilbert v. Synagro Cent., LLC,* 131 A.3d 1, 10 (Pa. 2015).

[3]    For ease of reference, the relevant portion of the Subdivision Plan as recorded is appended hereto.

Rosenmiller.[4]  The Starling Tract lies at the end of the aforesaid peninsula, which is accessed via Custer Drive, a dead-end road that terminates in a cul-de-sac at the northern end of the peninsula, which is bordered to the east by the Starling Tract, to the north by a narrow strip of contested land that descends to rip-rap[5] along the lakeshore, and to the west by a narrow strip of contested land along the western shore of the peninsula (we refer to the contested property along both the northern and western shores of the peninsula, collectively, as "the Disputed Property").  On the Plan, the Disputed Property is neither identified nor enumerated as one or more discrete lots, is not clearly bounded by any lines resembling the boundary lines used to denote individual properties in the Plan, and is not designated as a "recreational area" or for "lake access."  However, since at least 2002, the Association has maintained a community bulletin board and garbage cans on the Disputed Property, encouraging the impression that the Disputed Property is intended for communal use, and during that span it has been used as such.

On September 25, 1968, after it had sold most of the lots in the Plan, LMI deeded to the Association "ALL those roads, the dam, lake and basin, and [thirty-six specifically enumerated lots,] all more particularly shown on the plans of lots titled Lake Meade Subdivision, duly recorded in the office of the Recorder of Deeds of Adams County."  Complaint, Exh. D (Indenture, 9/25/1968, at 1) ("the 1968 Deed").  Notably, this conveyance made no direct reference to the Disputed Property.

---

[4]    Each deed conveyed, by its terms, "ALL That certain lot of land situated in Reading Township, Adams County, Pennsylvania, being more particularly described as Lot No. [725/726] on a plan of lots of LAKE MEADE SUBDIVISION, duly entered and appearing of record in the Office of the Recorder of Deeds of Adams County . . . ."

[5]    Rip-rap is "[a] loose assemblage of broken stones erected in water or on soft ground as a foundation."  THE AMERICAN HERITAGE COLLEGE DICTIONARY 1177 (3d ed. 1993).

The Rosenmillers sold the Starling Tract to Louise I. Cookson in 1974; Cookson conveyed the Starling Tract to A. Bailey and Doris A. Wood in 1977. The Starlings purchased the Starling Tract from the Woods on August 12, 2002.[6] A few years later, the Starlings built a house and, in 2006, they moved into their new home. Beginning more or less immediately, the Starlings "regularly encountered problems with unidentified individuals and groups fishing, picnicking, sunbathing, lounging, socializing, parking and loitering on and around . . . Custer Drive and the [Disputed Property]." Complaint at 9 ¶51. These same individuals parked their cars on Custer Drive and the Disputed Property, littered the cul-de-sac, and damaged the Starlings' lawn.

The Starlings began to complain to the Association in 2006. At first, the Association took steps to address the Starlings' concerns—for example, placing boulders and no trespassing signs around the cul-de-sac. However, the Association did not enforce the prohibition against trespassing and eventually removed the signs. Furthermore, it did not place such boulders along the western edge of Custer Drive.

In 2007, following a meeting between the Starlings and officers of the Association, the Association's attorney sent the Starlings a letter in which he contended that the Association held a fee simple interest in the Disputed Property that was conveyed by LMI in the 1968 Deed. *See id.* Exh. M (Letter of John W. Phillips, Esq., to the Starlings, 2/15/2007, at 1). The Starlings' attorney responded that the Starlings had "a genuine claim to extend the eastern[7] property line of [their] Lot 725 completely

---

6    Like all post-Rosenmiller deeds that preceded it, the deed conveying Lots 725 and 726 to the Starlings conveyed "ALL THAT CERTAIN lot of land situate in Reading Township, Adams County, Pennsylvania, being more particularly described as Lot #725 and Lot #726 on a plan of lots of Lake Meade Subdivision, duly entered and appearing of record in the Office of the Recorder of Deeds of Adams County."

7    This appears to be a reference to the southern property line of Lot 725, which runs east to west.

across the right[-]of[-]way of Custer Drive to the water line of Lake Meade and that [their] lot essentially surrounds and encompasses the full end of the cul-de-sac of Custer Drive." *Id.*, Exh. N (Letter of Jeffrey Ernico, Esq., to John Phillips, Esq., 4/26/2007, at 1).[8]

A few months later, the Association hosted an Independence Day celebration on the Disputed Property. Numerous vehicles, including fire trucks, parked along Custer Drive, and the party stretched late into the evening. On August 8, 2007, Attorney Phillips sent a letter to the Starlings on behalf of the Association reporting on the board's "consensus . . . that the measures taken to date, which have included placing boulders in the right[-]of[-]way to discourage parking on the Starling[s'] property, moving the bulletin board further down the cul-de-sac, increasing monitoring of the area, and increasing safety patrols have had the desired effect" of ensuring that all activities on

---

[8] The Starlings here claimed ownership of the entire end of the peninsula north of Lot 725's southern property line. This claim differs from the claim made in their Complaint that their parcel wrapped *around* the cul-de-sac and down the western shore of the peninsula. *See* Complaint at 7-8 ¶¶35-40 (asserting only ownership of that strip of land around the cul-de-sac). These competing accounts have remained a source of confusion throughout this litigation, not least because the Starlings at each judicial level have at times maintained one or the other position. Even in the trial court, their position appeared to shift between the filing of their Complaint and the filing of their brief in opposition to summary judgment. *See* Starlings' Brief in Opposition to Motion for Partial Summary Judgment at 5 ("The Starlings contend that the entire tip of Custer Peninsula is part of their Lots 725 and 726, subject to the Association's easement over the Custer Drive Right-of-Way."). Thus, the Superior Court's contention that the Starlings simply never laid claim to ownership of the entire end of the peninsula, including some portion of Custer Drive, is inaccurate. *See*, *e.g.*, *Starling v. Lake Meade Prop. Owners Ass'n, Inc.*, 121 A.3d 1021, 1032-33 (Pa. Super. 2015) (contending that the trial court misconstrued the Starlings as seeking ownership of the cul-de-sac itself when they claimed only ownership of the Disputed Property). Furthermore, before this Court, they again assert ownership over Custer Drive. *See*, *e.g.,* Starlings' Supreme Court Brief at 18 (proposing that if, as they maintain, the Association does not own the fee to Custer Drive, then "the Starlings own the underlying fee subject to the [Association's] ownership of an easement for ingress or egress"). For reasons set forth below, we consider both claims.

Custer Drive and the Disputed Property were "consistent with the uses allowed on other common areas." *Id.*, Exh. Q (Letter of John Phillips, Esq., to Jeffrey Enrico, Esq., 8/8/2007, at 1). Acknowledging the ongoing disagreement, Attorney Phillips suggested that the Starlings initiate a quiet title action to settle the ownership question.

The Starlings declined to file suit at that time, and discussions continued. The Association went on to host Independence Day parties on the Disputed Property in 2008 and 2009. In a 2009 Association newsletter, the Association promoted "[f]ishing [a]long Custer Drive," explaining that "the narrow strip of land facing toward the Marina is owned by [the Association]. Everything on the other side of the street is private property. Please respect the owners." *Id.*, Exh. U (*Lake Meader*, vol. 34 no. 4 (July 2009), at 2).

In December 2009, the Starlings and the board again met, but failed to reach an agreement. Adopting a new tack, the Starlings transmitted an email to the board contending that a lawsuit commenced against the Association by Louise Cookson in 1976 ("the *Cookson* Litigation") had resulted in a binding 1977 decree establishing that the Disputed Property and Custer Drive north of the southern boundary of Lot 725 were part of the Starling Tract. The Starlings noted that the common pleas court in *Cookson* had described Lot 726 as being bounded by Lake Meade on three sides and Lot 725 as being bounded by Lake Meade to both the east and west. *See id.*, Exh. L (Decree Nisi and Adjudication in *Cookson v. Bd. of Dirs., Lake Meade Prop. Owners Ass'n*, No. 5 Feb. Term 1976, at 1 (CCP Adams March 2, 1977) ("[Lots 725 and 726] are located on a part of the development [that] extends out into [Lake Meade] with Lot No. 726 being surrounded on three sides by the lake and Lot No. 725 being bounded on the east and west by the lake.")). The Association was unpersuaded.

The Starlings then filed suit against the Association, alleging trespass (Count I), ejectment (Count II), and seeking a declaratory judgment (Count IV) to the effect that the Starlings own the Disputed Property—specifically, they asked that the court "enter an Order conclusively establishing the boundary line of [the] Starling Tract at [the] southern end of the Disputed Portion of the Starling Tract and further declaring that the entire Starling Tract belongs to the Starlings." *Id.* at 26.[9] The Starlings asserted that the Association had exercised wrongful possession of the Disputed Property, as evinced by the placement of Association's garbage cans and bulletin board. Additionally, the Starlings claimed nuisance (Count III), alleging that the Association intentionally and unreasonably "permitted, encouraged and sponsored trespass and nuisance activity" infringing on their property rights. *Id.* at 25 ¶154. Finally, the Starlings sought declaratory and injunctive relief (Count V) to establish "the appropriate use of the [Disputed Property] and the Starling Tract and the appropriate use of Custer Drive." *Id.* at 29 ¶177.

After preliminary proceedings and discovery, the Association moved for partial summary judgment. It contended that the Starling Tract ended at Custer Drive's eastern edge. Thus, the Starlings had no claim to Custer Drive or the Disputed Property. The Association further averred that the Subdivision's Restrictions and Covenants did not preclude unit owners, their families, and their guests from "walking, biking, fishing, or socializing along [Custer Drive or the Disputed Property]." Association's Brief in Support of Its Motion for Partial Summary Judgment at 21.

---

[9] The Starlings' choice of terminology is somewhat confusing, but we read this as seeking a declaration that the Starlings own the entirety of what we refer to as the Disputed Property, ostensibly to some point near where the western shore of the peninsula turns west at the peninsula's base. In light of our ruling, the Starlings' intention as reflected in this wording is immaterial; its gist is clear.

Regarding ownership, the Association observed that the Plan depicts courses and distances for the Starling Tract that measure from the eastern waterline to the eastern edge of Custer Drive. No corresponding east-west boundary lines transect the road or appear on the Disputed Property west of Custer Drive. As to Lot 726, no course or distance denotes where the northern boundary lay, but the Plan depicts a point of tangency between the waterline and the northern edge of the Custer Drive cul-de-sac. As well, note 2 on the lower right-hand corner of the Plan (appended to this Opinion) provides: "Water-line (500 ft. elev.) is waterfront property line on all waterfront lots." Thus, the Association contended, the boundary of Lot 726 is where the water-line becomes tangent to the cul-de-sac's northern edge; nothing in the Plan's depiction suggests that Lot 726 wraps around the northern edge of the peninsula to continue down the western side. Because the Plan is unambiguous, the Starlings' attempt to introduce extrinsic evidence in the form of the *Cookson* decision and post-recordation surveys, tax maps, and behavior was impermissible. Thus, the Association was entitled to judgment as a matter of law on Counts I, II, and IV (trespass, ejectment, and the ownership claim), because each of those counts required the Starlings to establish a question of material fact regarding ownership or the right to possession of the Disputed Property, and the Starlings had failed to do either.

Regarding the Starlings' claim for declaratory and injunctive relief as to the use of Custer Drive and the Disputed Property, the Association contended that the Starlings' reliance upon the Plan's Restrictions and Covenants was infirm. The Association asserted that the restriction providing that lots other than those designated as "business or commercial areas" "shall be used exclusively for residential purposes" did not

encompass Custer Drive or the Disputed Property.[10]  *Id.* at 22.  Instead, the undesignated Disputed Property was free to be utilized in service of the outdoor recreation that was the stated purpose of the Subdivision.  Furthermore, applying the Starlings' strict definition of "residential purposes" would effectively "exclude activities incidental to residential uses, such as walking, biking, fishing, and other forms of socialization."  *Id.* at 23.  The Association maintained that the restriction relied upon by the Starlings was designed simply to ensure that lots designated for residential use were not converted to commercial purposes.  The Starlings also failed to identify any restrictive covenant limiting Custer Drive to "vehicular travel."  *Id.* at 24.  Furthermore, although it was enacted after the creation of the Subdivision, the Uniform Planned Community Act, *see supra* n.1, retroactively conferred upon the Association the power to "[r]egulate the use . . . of common elements" within the Subdivision.  68 Pa.C.S. § 5302(a)(6); *see* 68 Pa.C.S. § 5102(b) (providing for retroactive application to pre-enactment planned communities).  Thus, the Association was free to allow authorized individuals and their vehicles to utilize Custer Drive for more than just vehicular travel and to use the Disputed Property for recreational purposes.

The trial court granted the Association's motion.  Regarding the ownership questions, the court noted that it must seek to "ascertain and effectuate the intentions of the parties at the time of the original subdivision."  Trial Court Opinion ("T.C.O."), 1/15/2013, at 5 (citing *Pa. Elec. Co. v. Waltman*, 670 A.2d 1165, 1169 (Pa. Super. 1995)).  Where, as in this case, a deed describes the land to be conveyed

---

[10]  Interestingly, the Association does not argue that the last clause of the Restrictions and Covenants, which grants the Association discretion to "redesignate certain areas . . . to assure adequate facilities for its members" effectively authorized the Association to treat the undesignated Disputed Property as land to be used for recreation and lake access.  In any event, this omission is immaterial to our disposition.

only by lot number in a subdivision plan, the plan is "an essential part of the deed, giving [it] the same force and effect as if the plan had been copied into the conveyance." *Id.* at 5-6 (citing *Richardson v. McKeesport*, 18 Pa. Super. 199, 204 (1901)); *see Birmingham v. Anderson*, 48 Pa. 253, 260 (1864) ("Where a map or plan is thus referred to [in a deed] it becomes a material and essential part of the conveyance, and is to have the same force and effect as if it was incorporated into or copied into the deed.").

Turning to the Plan, the court recited the distances specified thereupon for the southern boundaries of Lots 721, 722, 723, 724, and 725, and underscored that those boundary lines extend from the eastern waterline only to the eastern edge of Custer Drive and no farther. Addressing Lot 726's lack of a measured northern boundary, the court recited the Plan's notation establishing that the waterline, at 500 feet elevation, "is [the] waterfront property line on all waterfront lots." *Id.* at 6; *see* Plan, Appendix note 2. Furthermore, "the northwest boundary of Lot 726 becomes tangent with [the Custer Drive cul-de-sac] at the 500[-]foot elevation water[-]line," establishing an unambiguous boundary at the depicted point of tangency. T.C.O. at 6-7. Accordingly, the Plan could sustain neither the Starlings' theory that Lot 725's southern boundary traversed Custer Drive to the western shore nor their contention that Lot 726 wrapped around the northern edge of the cul-de-sac and incorporated any portion of the Disputed Property. Regarding the wrap-around theory, the trial court observed that the Starlings' contention would lead to the absurd result that the owner of Lot 1020, located at the southwestern corner of the peninsula, also would have a competing claim to the Disputed Property. That is to say, if a point of tangency combined with the absence of clear dimensions could not bound Lot 726, the same logic would suggest that the northeastern boundary of Lot 1020, unaffected by its own depicted point of tangency with Custer Drive, extends northward along the peninsula's westward shore to include the Disputed Property.

Because the wrap-around theory would provide the owners of Lots 726 and 1020 with equally viable claims to the Disputed Property, such a theory could not reflect LMI's intent in designing the Plan.

Although the trial court evidently believed that the Plan was unambiguous,[11] it nonetheless reviewed the parol evidence submitted by the Starlings in opposition to summary judgment. The trial court first rejected the Starlings' reliance upon an Adams County tax map that purportedly showed the boundary of Lot 726 reaching around the northern edge of Custer Drive, observing that the Starlings' payment of taxes on the Disputed Property, if any,[12] would not be competent evidence of ownership. T.C.O. at 8 (citing *James v. Bream*, 106 A. 722, 723 (Pa. 1919)[13]). Next, the trial court rejected the Starlings' reliance upon the April 1974 survey that was attached to the 1974 deed from the Rosenmillers to Cookson. Although the survey was attached to that conveyance, neither that deed nor any other in the succeeding chain of title referred to that survey in describing the Starling Tract. Rather, each deed in the chain of title described the Starling Tract solely by reference to the Plan. Regarding the Starlings' reliance upon the *Cookson* Litigation, the court carefully delineated the issues that were decided in that case, explaining that the only boundary in dispute was that between the eastern

---

[11]    *See* T.C.O. at 7 (discussing the parol evidence introduced by the Starlings, "[d]espite the unambiguous Subdivision Plan which does not show boundary lines that extend over Custer Drive and through the land west of Custer Drive").

[12]    Based upon the information before it, the trial court disputed that the Starlings actually had done so.

[13]    Specifically, in *James* this Court held that "[a]ssessment and payment of taxes do not prove title, but are circumstances tending to support a claim of possession." 106 A. at 723. As discussed herein, possession and the right thereto may bear on trespass and/or ejectment, but in this case, as a practical matter, the Starlings seek to support their right to relief on these claims by virtue of ownership only, not some non-ownership-based possessory right.

part of the cul-de-sac and the Starling Tract, which had no bearing on the Disputed Property. Thus, the passing description of the boundaries of the Starling Tract in *Cookson* were *dicta* of no binding effect.[14]

Of particular relevance to our analysis, not least because it appears to have been the view adopted by the Superior Court, the trial court next considered the Starlings' argument that they must own the Disputed Property (and, ostensibly, Custer Drive) because the Association possesses only a right-of-way or easement[15] over Custer Drive, but no fee interest in the land beneath it. The Starlings argued that, by 1968, when LMI purported to convey to the Association, *inter alia*, all Subdivision roads, LMI no longer held a fee in those roads. Rather, upon its sale of many of the Subdivision's residential parcels, and in retaining the lots enumerated in the 1968 Deed, LMI effectively granted access easements to those purchasers as a matter of law and retained only such easements itself to the extent they attached to the properties it had retained until the 1968 Deed, somehow simultaneously converting its own fee interest in the Subdivision roads to no more than the same easement enjoyed by all holders of Subdivision parcels.[16] In rejecting this argument, the trial court found that, at the time of the 1968 Deed, LMI retained its fee interests in the Subdivision roads, and that the deed from LMI to the Association unambiguously reflected LMI's intention to convey the roads

---

[14] *See Cinram Mfg., Inc., v. W.C.A.B. (Hill)*, 975 A.2d 577, 581-82 (Pa. 2009) (holding that statements that are inessential to the reasoning in a judicial opinion are not binding in future cases).

[15] These terms may be, and are herein, used interchangeably. *See Lease v. Doll*, 403 A.2d 558, 561 (Pa. 1979) ("A right[-]of[-]way is an easement.").

[16] *See Kao v. Haldeman*, 728 A.2d 345 (Pa. 1999) ("When . . . lots are sold according to a subdivision plan on which a street has been plotted by the grantor, the purchasers acquire property rights in the use of the street. Such a right is sometimes called an easement of access[,] which means the right of ingress and egress to and from the premises of the lot owners." (internal quotation marks omitted)).

in fee to the Association.[17] Thus, the Association took fee simple ownership of the Subdivision roads subject only to the access easements of all Subdivision owners (including those who would come to own the residential lots that LMI conveyed to the Association in fee in the 1968 Deed).

For the foregoing reasons, the trial court granted the Association's motion for partial summary judgment as to the Starlings' claims for trespass, ejectment, and declaratory judgment regarding ownership of Custer Drive and/or the Disputed Property. Because each count required a showing of ownership or the right to possession of the contested property, and because the Starlings had failed to establish a genuine issue of material fact as to either, those claims failed as a matter of law. *See* T.C.O. at 13 & nn.2 & 3 (citing *Hartley v. Spencer*, 75 Pa. Super. 449 (1920), for the proposition that one may recover for trespass only upon proof of ownership and possession or the right thereto of the land at the time of the trespass, and *Wells Fargo Bank, N.A. v. Long*, 934 A.2d 76, 79 (Pa. Super. 2007), for the proposition that ejectment may only be had by one with the right to possess the property in question); *see Soffer v. Beech*, 409 A.2d 337, 340-41 (Pa. 1979) ("[T]he right to possession is the central element of [an action in ejectment]," which "has long been the general method for obtaining possession of real property. . . . [O]ur cases involving fee claimants speak only of the right to possession by one not presently in possession." (citations omitted)). In so ruling, the court determined that the Association retained a fee to Custer Drive and that the Starlings

---

[17]    Absent contrary indications on the face of the deed, the use of the word "grant" in a conveyance of land connotes the grantors' intent to pass fee simple title of the land so conveyed. *See* 21 P.S. § 2 ("[I]n any deed or instrument in writing for conveying or releasing land hereafter executed, unless expressly limited to a lesser estate, the words "grant and convey," or either one of said words, shall be effective to pass to the grantee or grantees named therein a fee simple title to the premises conveyed . . . .").

had no ownership or possessory interest in the Disputed Property outside the depicted point of tangency of the water-line and the northern edge of the cul-de-sac.

With regard to the Starlings' claim for an injunction restricting the use of Custer Drive to "vehicular travel,"[18] the court noted that no Subdivision covenant so limited the use of that road. The trial court observed that, were it to limit use of Custer Drive to "vehicular purposes" in the sense ventured, "activities such as walking, running and biking would not be permitted." T.C.O. at 16. Indeed, were the Starlings to host a party, their own guests would not be allowed to park on Custer Drive, because parking is not "vehicular travel." *Id.* This would contravene what the court deemed the "main purpose of the Subdivision, . . . the enjoyment of outdoor activities." *Id.* at 16-17.

With regard to the Starlings' claim for declaratory and injunctive relief precluding non-residential use of the Disputed Property,[19] the trial court found that the lack of designation of the Disputed Property for recreation or lake access was not conclusive in favor of the Starlings' claim. Rather, the Plan's stated "primary purpose" was to serve "the enjoyment of out of door recreation." Association's Motion for Partial Summary Judgment, Exh. E. Furthermore, the "Dedication" section of the Plan specified that all lots not designated "water supply" or "commercial" would be "either recreational areas, lake access areas, or residential lots." *Id.* The Disputed Property not having been designated water supply, commercial, recreational, lake access, or residential, the trial court found that "any lawful use is permitted" on the Disputed Property. T.C.O. at 15.

---

[18] *See* Complaint at 28 ¶175 (alleging that "[t]he Association is using and permitting its membership to use Custer Drive for purposes other than vehicular travel"), 29 ¶177(a) (seeking "[a] decree enjoining permanently the Association from using Custer Drive and its cul-de-sac for purposes other than vehicular travel").

[19] *See* Complaint at 29 ¶177(b) (seeking "[a] decree enjoining the Association from using the [Disputed Property] for non-residential purposes of any kind").

Finding no further controversy with respect to Count V, the court granted the Association summary judgment on Count V.

Following the trial court's entry of partial summary judgment for the Association, the parties entered a consent order dismissing the Starlings' remaining nuisance count (Count III), and the Starlings agreed not to seek damages. This rendered the trial court's judgment final, and the Starlings appealed to the Superior Court.

In a unanimous precedential opinion that largely adopted the Starlings' arguments, a three-judge panel of the Superior Court rejected the trial court's determination that the Association held a fee simple interest in Custer Drive. The Superior Court found it of "vast importance" that the Plan was recorded in 1967, the year before LMI deeded, *inter alia*, its interests in the Plan's roads to the Association. *Starling v. Lake Meade Prop. Owners Ass'n, Inc.*, 121 A.3d 1021, 1028 (Pa. Super. 2015). It also was in 1967 that the Rosenmillers acquired the lots comprising the Starling Tract. The court correctly noted that, "when lots are sold as part of a recorded subdivision plan on which 'a street has been plotted by the grantor, the purchasers acquire property rights in the use of the street.'" *Id.* at 1028 (quoting *Kao v. Haldeman*, 728 A.2d 345, 347 (Pa. 1999)). This "easement of access" "is a property right appurtenant to the land [that] cannot be impaired or taken away without compensation." *Id.* (internal quotation marks omitted); *see id.* (quoting RESTATEMENT (3d) OF PROPERTY—SERVITUDES § 2.13(1)) ("A description of the land conveyed that refers to a plat or map showing streets . . . implies creation of a servitude restricting use of the land shown on the map to the indicated areas." (Superior Court's emphasis omitted)).

From this uncontroversial proposition, though, the Superior Court proceeded to an inference that is unprecedented in Pennsylvania law:

> As of [the date of the 1968 Deed, LMI] did not own any road in fee interest absolute *because it had . . . sold lots in the [S]ubdivision.* As owner of

certain unsold lots in 1968, [LMI] owned an easement in the platted roads shown on the [Plan] when it conveyed the roads to the Association. The grantor in a deed cannot convey title to property greater than that owned by the grantor. *See Ecenbarger v. Lesoine*, 438 A.2d 969 (Pa. Super. 1981) (where grantor did not own property in fee but was co-owner, grantor could not convey easement over section of property owned in common with other grantors without joinder of other property owners). [LMI] simply did not own a fee simple interest in the platted roads in the [Subdivision] in 1968, when it purported to grant such an interest to the Association. The trial court therefore erred, as a matter of law, in ruling that the 1968 [D]eed created a fee simple absolute interest to the Association to Custer Drive in the [Subdivision] and that, as fee simple owners, the Association could continue to use Custer Drive as it wished.

Indeed, the logical implications of a finding that the Association owns, in fee simple absolute, the platted roads in the subdivision are far-reaching and counter-intuitive. If the Association owned the roads in fee simple absolute, it could sell those roads and permit houses to be built on them. It could allow them to be used as parking lots. The Association could thereby prevent access by [Subdivision] property owners to their lots.

*Id.* at 1029 (citation modified; emphasis added).

Thus, the Superior Court held that the trial court not only erred in entering summary judgment with regard to trespass, ejectment, and ownership of Custer Drive, but it also erred in denying declaratory and injunctive relief regarding the Association's usage of Custer Drive. It held that, because the Association has no greater right to the use of Custer Drive than is enjoyed by any holder of a Subdivision lot, the Association was entitled only to use Custer Drive for "vehicular and pedestrian ingress and egress."[20] *Starling*, 121 A.3d 1031. Thus, the Superior Court reversed the trial court's entry of judgment on Counts I, II, and on Count IV to the extent that it established the Association's ownership of Custer Drive, and it directed the trial court to enter judgment

---

[20] The Superior Court characterized this remedy as "the relief requested in Count V of the Complaint," but, as noted *supra*, the Starlings actually sought an injunction precluding all use but "vehicular travel," without any allowance for pedestrians.

in the Starlings' favor on their prayer for injunctive relief regarding the use of Custer Drive.

That left only the question of ownership and use of the Disputed Property. In this connection, the Superior Court found that the Plan was ambiguous. The court then reviewed the Starlings' parol evidence, every item of which post-dated the recordation of the Plan, and found that genuine issues of material fact remained regarding whether Lot 726 wrapped around the cul-de-sac to encompass some portion of the strip of land west of Custer Drive. Thus, the court specifically remanded for further fact-finding on the ownership question. With regard to use, the court was less clear, but its opinion at least suggested that the absence of an express Plan designation of the Disputed Property for common use precluded non-residential use such as that alleged by the Starlings. *See id.* at 1031 ("The fact that the Starlings do not own the triangular shaped piece of land, however, does not mean that the Association does own it and can allow people to use it for recreational purposes."), 1033 ("In sum, we remand for the grant of partial relief to the Starlings as to [C]ount [V] . . . and for entry of an injunction permanently enjoining use of the entirety of the platted Custer Drive and the entirety of its platted cul[-]de[-]sac to any use other than for ingress and egress.").

Interestingly, in analyzing this consideration, the court appeared to understand the Starlings as seeking only the northwestern bulge opposite Lot 726, which the court referred to as "the triangular-shaped piece of land." *Id.* at 1024. However, based upon our review, the Starlings never restricted their claim in that fashion before the trial court, nor did they do so in their briefing to the Superior Court. Indeed, contrary to the Superior Court's claim, before that court the Starlings were less than clear about whether they sought ownership of the entire peninsula north of the southern boundary of Lot 725 or merely some indeterminate portion of the land to the north and west of

Custer Drive, and in any event, nowhere did the Starlings so much as refer to any land as triangular. Thus, while the Superior Court correctly observed that the Starlings' Complaint never appeared to assert ownership of Custer Drive, the court was simply wrong to suggest that the Starlings never raised that argument in the trial court at all, *see supra* n.8, or that their arguments on appeal were so focused.[21]

## II. Analysis

We granted allowance of appeal to consider three issues. Although the two issues we reach were stated in terms of the Superior Court's apparent determination that the fee to Custer Drive was surrendered by LMI (or effectively extinguished entirely) as soon as LMI sold the first Subdivision lot and the Superior Court's alleged conclusion that "extrinsic evidence can vary property boundaries on a recorded subdivision plan,"[22]

---

[21] *Cf.* Starlings' Superior Court Brief at 10 ("The Starlings contend that the entire tip of Custer Peninsula is part of their Lots 725 and 726, subject to the Association's easement over Custer Drive."), 22 (quoting the affidavit of an agent for the developer that was submitted in the *Cookson* Litigation: "[T]hrough inadvertence of [LMI], the Plans of Lots 725 and 726 prior to the recording were not corrected to show the actual intent of the parties but rather to show the [*sic*] Custer Drive to extend through Lot 725 to the shoreline of Lake Meade" (emphasis in original)), 26 ("Accordingly, the trial court's holding that the area between Custer Drive and Lake Meade on the western side is owned by the Association is without support in the existing record.").

[22] Adopting the Association's formulation of the issues verbatim, our order granted review of the following issues:

> 1. Whether the Superior Court erred as a matter of law in holding that a fee simple owner of a private road who grants an easement over that road extinguishes its fee simple ownership of the road?

> 2. Whether the Superior Court's decision conflicts with Pa.R.C.P. 1035 when the court reversed the trial court's grant of summary judgment and directed the entry of injunctive relief in favor of the [Starlings] and did so without considering the facts of record found by the trial court, without considering the record in the light most favorable to [the

(continued…)

the lower courts, and now we, find that the most sensible way to resolve these issues is to address ownership and use of Custer Drive and the Disputed Property as such, which implicate and are encompassed by the issues as stated.  For clarity of analysis, we address both ownership questions first, then take up the question of use.

A.  Standard of Review

Appellate review of summary judgment entails a question of law.  Accordingly, we review the Superior Court's reversal of the trial court's order *de novo,* and we need not defer to either lower tribunal's determinations.  *See Summers v. Certainteed Corp.*, 997 A.2d 1152, 1159 (Pa. 2010).  In reviewing the lower courts' rulings, we apply the same legal standard as the trial court.  *Albright v. Abington Mem. Hosp.*, 696 A.2d 1159, 1165 (Pa. 1997).

> Summary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. . . .  The reviewing court must view the record in the light most favorable to the nonmoving party, resolving all doubts as to the existence of a genuine issue of material fact against the moving party.  When the facts are so clear that reasonable minds cannot differ, a trial court may properly enter summary judgment.

---

(…continued)
> Association], and where there are general issues of material fact precluding the entry of judgment in the [Starlings'] favor?
>
> 3.    Whether the Superior Court erred as a matter of law in concluding that extrinsic evidence can vary property boundaries on a recorded subdivision plan?

*Starling v. Lake Meade Prop. Owners Ass'n, Inc.*, 133 A.3d 733 (Pa. 2016) (*per curiam*). As explained below, our disposition of the ownership and use-related issues provides the answers to issues one and three and renders issue two moot.

*Gilbert v. Synagro Cent., LLC*, 131 A.3d 1, 10 (Pa. 2015) (quoting *Atcovitz v. Gulph Mills Tennis Club*, 812 A.2d 1218, 1221-22 (Pa. 2002) (citations omitted)).   In the specific context of boundary disputes, we have drawn the following distinction, which is critical to understanding what we can—and cannot—decide in the summary judgment phase:

> The meaning of a deed—that is, what it covers—is a question of law for the court; what the boundaries of a given piece of land are is a question of construction for the court also; where they are is a question of fact for the jury.  Where the boundary lines of a grant are fixed by the grant itself, the question as to what these lines are is purely one of law."

*Miles Land Co. v. Hudson Coal Co.*, 91 A. 1061, 1064 (Pa. 1914) ((citations and internal quotation marks omitted))

### B.  The Ownership Issues

We first must address the above-mentioned confusion regarding whether the Starlings asserted ownership of the entire northern section of the peninsula encompassing some portion of Custer Drive, with the southern boundary of their claim presumably delineated as the extension of Lot 725's southern boundary across Custer Drive to the western water-line—what we have referred to as the cross-cutting theory— or asserted only ownership of the Disputed Property itself, *i.e.*, some contiguous portion of the Plan extending Lot 726 around the northern edge of the cul-de-sac and down the western shore, west of Custer Drive, to some southern boundary the location of which cannot conclusively be gleaned from the Starlings' pleadings, *i.e.*, the wrap-around theory.  For the reasons set forth *supra*, we conclude that the Starlings gave both the trial court and the Superior Court ample reason to believe that they pursued both theories in the alternative.  *See*, *e.g.*, *supra* nn.8, 21, and accompanying text.  The trial

court appeared to approach the case upon this basis, but the Superior Court nominally rejected it, although its opinion nonetheless seemed to address aspects of both theories. In any event, there is no question that the Starlings now maintain that their tract actually extends across the peninsula entirely and encompasses Custer Drive. In their view, the Association enjoys only the same access easement enjoyed by the other owners in the Subdivision. Nonetheless, in the analysis that follows, we give them the benefit of, and address at length, both theories, not least because the Starlings' underlying complaint clearly is more consistent with the wrap-around theory. *See* Complaint at 26 (seeking a declaration "establishing the boundary line of [the] Starling Tract at [the] southern end of the Disputed Portion of the Starling Tract," *i.e.*, the Disputed Property).

The same principles that apply to the interpretation of a contract apply to the interpretation of a deed. *See New Charter Coal Co. v. McKee*, 191 A.2d 830, 834 (Pa. 1963). The nature and quantity of the interest conveyed by a deed "must be ascertained from the instrument itself." *In re Property of W.R. Covert*, 186 A.2d 20, 23 (Pa. 1962) (quoting *Yuscavage v. Hamlin*, 137 A.2d 242, 244 (Pa. 1958)). When a deed incorporates by reference a subdivision plan, the plan becomes "a material and essential part of the conveyance, and is to have the same force and effect as if it was incorporated into or copied into a deed." *Birmingham*, 48 Pa. at 260. "[W]e seek to ascertain not what the parties may have intended by the language but what is the meaning of the words," or, in this case, the words as informed by the Plan's depiction. *Property of W.R. Covert*, 186 A.2d at 23 (emphasis omitted). Thus, "the language of the deed shall be interpreted in the light of the subject matter, the apparent object or

purpose of the parties and the conditions existing when it was executed." *Highland v. Commonwealth*, 161 A.2d 390, 402 (Pa. 1960). "If the deed is ambiguous, then all of the attending circumstances existing *at the time of the execution of the instrument* should be considered to aid in determining the apparent object of the parties." *Stewart v. Chernicky*, 266 A.2d 259, 263 (Pa. 1970) (emphasis added); *accord Clancy v. Recker*, 316 A.2d 898, 902 (Pa. 1974). When parol evidence is admissible, "it must generally have a foundation in pre-existing evidence of fraud, accident or mistake," except when it is introduced "not to contradict or vary, but to explain the contract, as when something is omitted . . . so as to qualify the tribunal passing upon the writing to interpret it truly according to the intent of the parties." *Baltimore & Phila. Steamboat Co. v. Brown*, 54 Pa. 77, 81-82 (1867). Because no one maintains that any relevant deed or the Plan itself is the product of fraud, accident, or mistake, it is necessary to focus upon the Plan. If we conclude that the Plan's depiction is ambiguous, we may consider only such parol evidence as bears upon LMI's contemporaneous intention in preparing and recording the Plan. *See Highland*, 161 A.2d at 402; *Wilkes-Barre Twp. Sch. Dist. v. Corgan*, 170 A.2d 97, 98 (Pa. 1961).[23]

---

[23]     Before the Superior Court, the Starlings acknowledged that LMI's intention governs the interpretation of the Plan. *See* Starlings' Superior Court Brief at 23 ("[T]he trial court correctly recognizes that the intent of [LMI] is what controls the interpretation of the [Plan]."). Thus, even if we find the Plan ambiguous, no parol evidence unrelated to LMI's intent at the time of the Plan's recordation would be pertinent. While one might colorably argue that LMI's conduct in the time between their recordation of the Plan and the 1968 Deed is relevant, insofar as their conduct immediately in the wake of devising and recording the Plan might imply something about their contemporaneous understanding of the Plan, certainly no extrinsic evidence after the 1968 Deed has any bearing upon LMI's "apparent object or purpose . . . when [the Plan was recorded]." *Highland*, 161 A.2d at 402. Thus, the learned Dissent's reliance upon the Starlings' evidence that they pay taxes on some portion of the disputed property and its citation of
(continued…)

*Custer Drive*

Given the indisputable fact that LMI owned the fee to the property under Custer Drive at some point during the design and development of the Subdivision, the Superior Court's determination that the Association had no fee interest in Custer Drive when it purported to convey the fee to the Subdivision's roads to the Association in the 1968 Deed[24] necessarily derived from one of two conclusions: Either LMI surrendered its fee

---

(…continued)

the Association's putative 2007 "admission" that Lot 726's boundary line "is undeterminable," *see* Conc. & Diss. Op. at 8, to establish a disputed issue of material fact are misplaced. *See City of Pittsburgh v. Weinman*, 134 A. 382 (Pa. 1926) ("[A]ssessment and payment of taxes on property is not proof of title . . . ."); *James*, 106 A. at 723 (same); *Grace Bldg. Co. v. Parchinski*, 467 A.2d 94 (Pa. Cmwlth. 1983) (rejecting proffered tax deed and county tax map because the documents were insufficient both to identify the boundaries of the parcel in dispute and to locate them on the ground); *cf.* T.C.O. at 8 (noting that the most recent tax documents of record in fact disfavor the Starlings' claim of ownership). The same can be said about the Starlings' invocation of the 1974 Survey, which cannot, by itself, inform LMI's intention at the time of Recordation. The Dissent's suggestion that these matters are cited "only to demonstrate the record contains genuine issues of material fact regarding ownership" does not alleviate the problem. Conc. & Diss. Op. at 8 n.1. The evidence is (and by definition, must be) legally irrelevant to the resolution of any factual dispute regarding the contemporaneous intention reflected in a conveyance that preceded the evidence by years. It logically follows that the same incompetent evidence cannot establish that such a dispute existed in the first place. That the current parties dispute ownership does not, by itself, establish a factual dispute regarding the question of what the boundary was intended to be at the time of the recordation of the Plan and the conveyances by LMI of Lots 725 and 726 to those lots' first owner.

Regarding the Dissent's suggestion that an ambiguous deed must be interpreted in favor of the non-drafting party, *id.* at 4, we note that the Association did not draft the Plan or the deeds in question; rather, LMI did. Hence, this particular interpretive principle has no bearing upon this case. The remaining interpretive principles cited by the Dissent as "more properly applicable to interpreting a deed or subdivision plan," *id.* at 3, are not only consistent with the familiar array of tools at our disposal for the interpretation of ambiguous contracts of any sort, they also are reflected in our own recitation of the governing principles.

[24] "As of [the date of the 1968 Deed, LMI] did not own any road in fee interest absolute *because it had . . . sold lots in the [S]ubdivision.* As owner of certain unsold (continued…)

upon its first sale of a residential lot, presumably in sections corresponding to each lot as those lots were purchased, *or* the fee to all roads entirely ceased to exist upon that first residential sale. This, in turn, would appear to require the utterly unintuitive result that all Subdivision owners and the Association itself own an access easement over land that, by virtue of being owned by no one, presumably need not be servient to such an easement to ensure its availability for use to all authorized entrants to the Subdivision itself. Thus, in just a few sentences, and without reference to supporting authority, the Superior Court cast a shadow over the title to the roads, and for that matter all common areas, of every planned community in the Commonwealth of Pennsylvania.

As well, the court's sweeping account of the Association's prerogatives if it held a fee to the roads[25] is patently at odds with hornbook law regarding a property owner's rights when the property in question is servient to an easement. It is beyond cavil in Pennsylvania that a property owner may use his property only in ways that do not interfere with the rights of the easement holder. *See Minard Run Oil Co. v. Pennzoil Co.*, 214 A.2d 234, 235 (Pa. 1965) ("The owner of the servient tenement may make any use thereof which is consistent with or not calculated to interfere with the exercise of the easement." (citation omitted)); *Mercantile Library Co. of Phila. v. Fid. Trust Co.*, 83 A.

---

(…continued)
lots in 1968, [LMI] owned an easement in the platted roads shown on the [Plan] when it conveyed the roads to the Association." *Starling*, 121 A.3d at 1029 (emphasis added).

25      "If the Association owned the roads in fee simple absolute, it could sell those roads and permit houses to be built on them. It could allow them to be used as parking lots. The Association could thereby prevent access by [Subdivision] property owners to their lots." *Starling*, 121 A.3d at 1029.

592, 595 (Pa. 1912) ("The grant of a fee, subject to an easement, carries with it the right to make any use of the servient soil that does not interfere with the easement . . . ." (citation omitted)). Thus, insofar as the Superior Court correctly noted that all owners in the Subdivision held an access easement to the roads, it necessarily followed that no fee owner of Custer Drive could permit houses to be built upon it, designate it as a parking lot, or otherwise "prevent access by . . . property owners to their lots," *Starling*, 121 A.3d at 1029, and the Starlings never have suggested that the Association has sought in any way to do so.

In arguing in favor of affirmance of the Superior Court's rejection of the Association's ownership of Custer Drive, the Starlings direct our attention to two authorities, *Allen v. Scheib*, 101 A. 102 (Pa. 1917), and *Sides v. Cleland*, 648 A.2d 793 (Pa. Super. 1994), the latter of which the Superior Court deemed "dispositive," albeit perhaps of the use issue rather than the ownership issue (on this point, the intermediate court was not entirely clear). *See Starling*, 121 A.3d at 1029. In any event, we address these cases in turn.

In *Allen*, a testator devised forty acres of his 142-acre property to four family members in various acreages, but without specifying the portion of the larger estate from which to take those forty acres. Later, the family arranged for the forty acres to be taken from a corner of the farm inaccessible from the public highway adjacent to the larger estate. By the same arrangement, a private road from the public road along the border of the full property to the captive property was set aside by agreement, and that private road was used without conflict for approximately twenty years by the occupants of the devised properties. Later, the title to the entire forty-acre tract, along with

"whatever interest the owners thereof had in the lane," became vested in John Scott Harbison, who conveyed the full tract to Eleanor Allen in 1911. *Id.* at 102-03.

Over time, the balance of the original farmstead was further subdivided such that, ultimately, two distinct owners, the defendants in the *Allen* action, held the land on either side of the access road. Setting aside those owners' apparent disputes regarding ownership of the road, Allen eventually contended that ownership in fee of the lane, rather than a mere easement, was included with her ownership of the forty-acre tract. Allen retained a contractor to install and maintain a gas line to run along the private road. However, the defendants managed "by opposition and threats" to prevent construction. *Id.* at 103. The *Allen* litigation followed.

This Court held first that if Allen owned only an easement, then she was entitled to use it only for the use for which it was dedicated. *Id.* Conversely, if Allen owned the fee to the road, then she was entitled to construct her gas line. Although no deed showed conveyance of the road in fee by the original devisees to Allen's predecessor, reference was made in the conveyance corresponding to one of the other tracts, which described a boundary of that tract as running "[t]hence along a certain road or lane between the land herein conveyed and the land of John Stirling." *Id.* Generally speaking, we explained, "[t]he term 'road,' and especially 'private road,' is indicative of an easement rather than a fee." *Id.* Thus, "[t]he mere reference in a conveyance to a private road does not tend to show ownership in fee thereof in the party for whose use it may have been established." *Id.* at 104. In such a situation, such a road "may, *prima facie*, be used by all abutting owners, and defendants as such would have standing to object to an additional use being made thereof by the construction therein of a gas line."

*Id.* The Court concluded that Allen, as owner of the captive forty-acre plot for the benefit of which the road had been created, had "a right to the free and uninterrupted use thereof as a way for purposes of passage over and upon the same; and, so far as appears, defendants may lawfully make such use thereof as will not interfere with the rights of plaintiff." *Id.* However, being the claimant, Allen bore the burden of establishing ownership and failed to do so. Accordingly, her interest was in the nature of an easement, and she was not entitled to run a gas line to her captive property.

This case actually undermines the Starlings' argument in two regards. First, nothing in *Allen* suggested that no party owned a fee to the road, or that the conveyance of a road easement extinguished such a fee. Even given the Starlings' decontextualized reading of our holding that, absent a contrary indication, the use of the word "road" in a deed suggests the conveyance only of an easement, nothing about *Allen* suggests that LMI, once having held the fee, conveyed, abandoned, or extinguished that fee simply by selling off Subdivision lots, and, in so doing, retained only access easements to the Subdivision roads. Second, in *Allen* we clearly imposed the burden of establishing the necessary fee upon Allen as plaintiff rather than merely negating the fee of others, which we never endeavored to ascertain. As set forth above, the Starlings have failed to establish their own fee to Custer Drive, which undermines their attempt to enjoin Association uses of Custer Drive that do not interfere with the Starlings' use and enjoyment of their own easement over that road.

*Sides* has even less bearing in this case. In *Allen*, at least, there was an embedded fee issue. In *Sides*, however, at issue was not ownership of the trail; the defendant in that case undisputedly held the fee to the trail, subject to a right-of-way

explicitly reserved in the subdivision plan. Rather, the dispute in *Sides* concerned the *use* of that right-of-way. The Starlings' discussion of *Sides*, although it appears in connection with their argument regarding ownership of Custer Drive, basically *assumes* that the Association does not own Custer Drive, and then attempts to use *Sides* to support the Superior Court's entry of injunctive relief against the Association concerning Custer Drive. We take up the question of use, *infra*, but *Sides* is useful in neither connection. Furthermore, as a Superior Court decision, *Sides* would not bind us even if it was on-point.

In light of the foregoing, we are left with the conclusion as a matter of law that the Association retains the fee to Custer Drive. The trial court correctly so held, and the Superior Court erred in overturning that determination.

*The Disputed Property*

This leaves the Starlings' wrap-around theory.[26] The Association argues that we must reject the Superior Court's determination that the Starlings' pleadings and proofs established a triable factual dispute regarding the Starlings' alleged ownership and/or possessory rights in the Disputed Property and restore the trial court's determination that the Starlings, in failing to establish such a factual dispute, did not state *prima facie* claims for trespass and ejectment. *See Soffer*, 409 A.2d at 340-41.

Two competing accounts of the Plan arise due to the lack of metes and bounds defining the northern boundary of Lot 726 and the concomitant lack of unequivocal

---

[26] We are left to consider the wrap-around theory, because in determining that the Starlings have no ownership interest in Custer Drive, their cross-cutting theory necessarily is infirm for that reason, if no other. Thus, any tenable ownership and use claims concerning the Disputed Property that remain can be sustained only pursuant to the wrap-around theory, which also is consistent with the wording of their Complaint.

denominations establishing the northern and southern ends of the Disputed Property. However, the prohibition on any interpretation that leads to an absurd result enables us to bring the Plan into sharper focus. *See Pocono Manor Ass'n v. Allen*, 12 A.2d 32, 35 (Pa. 1940) ("Before a court will interpret a provision in a . . .contract in such a way as to lead to an absurdity or make the . . . contract ineffective to accomplish its purpose, it will endeavor to find an interpretation which will effect the reasonable result intended.").[27]

In order for the Starlings' wrap-around theory to succeed, it must be the case that LMI did not intend for the depicted tangency between the cul-de-sac and the waterline to constitute a boundary. However, if the tangency is immaterial to the determination of Lot 726's boundary, then that necessarily entails that we treat *no* similar point of tangency on the peninsula as a boundary. As the trial court noted, such a conclusion would lead to the patently absurd result that, just as there is no clearly intended boundary to Lot 726 to the north or west, there also can be no clear northeastern boundary to Lot 1020. *See* T.C.O. at 6-7. If those points of tangency bound neither Lot 726 *nor* Lot 1020, then the owners of those lots both have a viable claim to the entirety of the Disputed Property, because there is no notation or boundary other than the tangencies to suggest where one lot ends and the other begins. Taken to its logical

---

[27] The Dissent distinguishes *Pocono Manor* from the facts of this case at length, *see* Conc. & Diss. Op. at 6-7, but appears not to appreciate that our "claim[ed] reliance" on that case extends no further than the uncontroversial principle of contract and deed interpretation stated, not as binding or analogous authority on the particular issues now before us. Just as the Dissent relies upon the inapposite case, *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186 (Pa. 2007), to establish the standard governing review of a motion for summary judgment, *see* Conc. & Diss. Op. at 2, we cite *Pocono Manor* merely for a legal principle that applies in myriad circumstances, including the interpretation of a facially ambiguous deed.

extreme, the Starlings' argument could result in the Starlings and the owners of Lot 1020 having opposing claims to each other's entire lot.

In a case such as this, where the only metes and bounds available to us are illustrated but not described, we confront an arguable ambiguity where the boundaries are depicted with less information than is necessary to define with certainty the property in question. However, we must interpret the Plan as a whole, and we need no parol evidence to infer that LMI did not intend to invite a property dispute between the owners of Lot 726 and Lot 1020. Thus, we must seek to construe the Plan in any reasonable way that avoids that absurd result. Here, the interpretation this principle requires is clear: LMI must have intended both properties to be bounded by their boundaries' respective points of tangency with Custer Drive,[28] because that is the only principled interpretation that creates ascertainable boundaries to both 726 and 1020.

That ruling alone does not eliminate the explanatory limitations of the Plan and the actual location on the ground of that point of tangency with the northern edge of the Custer Drive cul-de-sac as depicted on the Plan. It also is not clear that the Plan's shoreline as depicted in 1967 corresponds to the 500-foot elevation line described in note 2 to the Plan. But it is LMI's intent at the time of the Plan's design and recordation that must govern the identification of the intended boundary, and we find that LMI intended Lot 726 to terminate where the depicted northern boundary becomes tangent with the cul-de-sac. Thus, the Superior Court erred insofar as it determined that a fact

---

[28]    It seems appropriate to note one last time the undisputed proposition that Custer Drive, as depicted on the Plan, encompasses significantly more land than the paved portion of Custer Drive. Indeed, the non-cul-de-sac portion of Custer Drive is measured sixty feet wide on the Plan.

question remained regarding whether Lot 726 wraps around the northern end of the peninsula to encompass some portion of the Disputed Property along the western shore.  Contract interpretation is a question of law for the court; ambiguities are to be resolved in favor of a reasonable rather than an absurd or unreasonable interpretation; and here it was unreasonable to imagine that LMI intended to leave the owners of Lots 726 and 1020 squabbling in perpetuity over who owns how much of the Disputed Property.  Interpreting the points of tangency as boundaries of the properties to which they correspond is the reasonable of two alternative interpretations, and, as such, it is the correct one.

We emphasize, though, that we are not here called upon to determine where precisely that point lies on the ground.  Nor do we purport to do so.  We declare here only what the boundary *is* according to the Plan.  *See Miles Land Co.*, 91 A. at 1064. The Starlings asked the trial court to "enter an Order conclusively establishing the boundary line of [the] Starling Tract at [the] southern end of the Disputed Portion of the Starling Tract and further declaring that the entire Starling Tract belongs to the Starlings."  Complaint at 26.  Thus, the question of where precisely the boundary *lies* is not at issue; at issue is whether their tract includes the Disputed Property.  It does not. For the foregoing reasons, the trial court correctly granted the Association's motion for summary judgment on this claim, in effect determining that no fact question remained the resolution of which would entitle the Starlings to the relief requested.[29]

---

[29]  Much of the Dissent relies upon the premise that the boundary dispute regarding Lot 726 cannot be decided as a matter of law, but rather must be submitted to a fact-finder.  *See* Conc. & Diss. Op. at 7 ("The identification of the boundary line in this matter cannot be determined as a matter of law for purposes of summary judgment.").  This (continued…)

<u>C. The Use of Custer Drive and the Disputed Property</u>

In light of our above ruling, it is clear that the Starlings are not entitled to the injunctive relief they seek with respect to Custer Drive and its cul-de-sac. We have determined as a matter of law that the Association holds the fee to Custer Drive as depicted on the Plan. Like every other Subdivision owner, the Starlings have an access easement to Custer Drive and nothing more. The Association, as owner of Custer Drive, can utilize that road however it sees fit, provided it does not interfere with the Starlings' (and any other Subdivision owner's) access easement. *See Minard Run Oil Co.*, 214 A.2d at 235 ("The owner of the servient tenement may make any use thereof which is consistent with or not calculated to interfere with the exercise of the easement." (citation omitted)); *Mercantile Library Co. of Phila.*, 83 A. at 595 ("The grant of a fee, subject to an easement, carries with it the right to make any use of the servient soil that does not interfere with the easement . . . ." (citation omitted)). Thus, the Starlings have no entitlement to injunctive relief restricting the Association's non-interfering uses of Custer Drive, and they have not claimed any such interference in the instant matter.

---

(…continued)
misunderstands the narrow scope of our ruling, which hinges upon a distinction—one that the Dissent's own citations reinforce—between *identifying* a boundary (a question of law) and *locating* a boundary (a question of fact). *See Miles Land Co.*, *supra*; *cf. Grace Bldg. Co., Inc., v. Parchinski*, 467 A.2d 94, 96-97 (Pa. Cmwlth. 1983) (recognizing the distinction between *identifying* boundaries and *locating* them). It also disregards that, fairly construed, the Starlings' complaint asserts ownership of the Disputed Property generally, not by reference to a specific line or a clearly-defined location. For present purposes, we decide only that the depicted point of tangency on the Plan where Lot 726's boundary touches the cul-de-sac bounds the Starlings' property, which plainly is a ruling regarding *what* the boundary is. To the extent the parties seek further clarification, our ruling is not intended to prejudice future efforts to seek it, but that issue is not squarely presented in the case as we find it.

For this reason, the Superior Court erred in directing the trial court to grant injunctive relief to the Starlings *vis-à-vis* Custer Drive.

With respect to the Disputed Property, having identified as a matter of law that the point of tangency between the northern boundary line of Lot 726 and the cul-de-sac as depicted in the Plan bounds the Starling Tract, we must conclude that the Starlings have no ownership or possessory interest to any of the property that lies north, west, and south of the point of tangency. However, in connection with the use of the Disputed Property, the Starlings originally argued that even if they did not prevail on their claim for ownership of that property, they nonetheless were entitled to injunctive relief regarding its use for "non-residential purposes." Complaint at 27-29 ¶164-177. Thus, resolving the ownership question does not conclude the matter.

The trial court granted the Association's motion for summary judgment on this issue, as well. It noted that the General Notes to the Subdivision Plan specify that the primary purpose of the plan is "for the enjoyment of out of door recreation." T.C.O. at 14. Reviewing the Dedication section of the Subdivision Plan, the court noted that, "unless designated as a water supply lot or commercial area, all other lots are recreational areas, lake access areas or residential lots." *Id.* The Disputed Property, being none of the above, but rather "a small strip of undesignated shoreline property" "without a specific designation," the trial court concluded that "any lawful use is permitted" on the Disputed Property. *Id.* at 15. Thus, no relief was due.

On appeal to the Superior Court, the Starlings challenged this ruling in tandem with their challenge to the trial court's entry of summary judgment in the Association's favor concerning the use of Custer Drive. However, while the Superior Court ruled in

the Starlings' favor with regard to Custer Drive, its determination that a question of fact remained regarding ownership of the Disputed Property precluded deciding any subsidiary questions regarding use of that property. Although the Superior Court seemed skeptical about the complained-of uses of the Disputed Property, it evidently recognized that it would be premature to venture a legal opinion on that subject. If further proceedings in the trial court resulted in a determination that the Starlings owned the Disputed Property, any questions regarding Association use thereof would be moot. Thus, when the court "remand[ed] for the grant of partial relief to the Starlings as to count five" of their complaint, *Starling*, 121 A.3d at 1033, it referred to its entry of injunctive relief as to "the entirety of the platted Custer Drive and the entirety of its platted cul[-]de[-]sac," *id.*, *i.e.*, the road and its right of way as designated on the Plan, but did not dictate such relief with respect to the Disputed Property, the ownership of which remained unresolved in the wake of the Superior Court's ruling.

With today's decision, we effectively reinstate the trial court's entry of partial summary judgment. We do not purport to rule upon the question of the Disputed Property's use, an issue as to which the Superior Court demurred as a consequence of its divergent ruling. Thus, on remand, the Superior Court is free to consider the question whether the trial court erred in determining that the covenants and restrictions did not preclude the Association's recreational use of the Disputed Property.

### D. Conclusion

For the foregoing reasons, we reverse the Superior Court's order insofar as it reversed the trial court's entry of partial summary judgment in the Association's favor with respect to counts I, II, and IV of the Starlings' Complaint. We further reverse the

Superior Court's order directing the entry of judgment in the Starlings' favor on their claim for injunctive relief regarding the use of Custer Drive, as well as its reversal of the trial court's determination that the Association did not own Custer Drive in fee simple subject to Subdivision owners' access easements and any other established rights-of-way.[30] We remand this case for further proceedings consistent with this Opinion.

Chief Justice Saylor and Justices Todd and Mundy join the Opinion.

Chief Justice Saylor files a concurring opinion.

Justice Baer concurs in the result.

Justice Dougherty files a concurring and dissenting opinion.

Justice Donohue did not participate in the consideration or decision of this case.

---

[30] These rulings effectively dispose of the first and third issue as to which we granted review, and obviate any need to consider the second issue. Because we find that the Superior Court erred in granting relief to the Starlings for substantive reasons, whether it overstepped its contextual authority in doing so is moot.

