**IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| RAY M. BOURGEOIS AND MARY ANN I. BOURGEOIS, | : | No. 50 MAP 2019 |
| | : | |
| | : | Appeal from the Order of the |
| Appellants | : | Superior Court at No. 1086 MDA |
| | : | 2017 dated August 14, 2018, |
| | : | Reconsideration Denied October 23, |
| v. | : | 2018, Affirming the Order of the York |
| | : | County Court of Common Pleas, |
| | : | Civil Division, at No. 2015-SU- |
| SNOW TIME, INC. AND SKI ROUNDTOP OPERATING CORPORATION, | : | 001900-71 dated June 19, 2017. |
| | : | |
| | : | ARGUED: March 10, 2020 |
| Appellees | : | |

## OPINION

**JUSTICE MUNDY**                                          **DECIDED: December 9, 2020**

In this appeal by allowance, we consider whether the Superior Court erred in affirming the trial court order granting summary judgment in favor of Snow Time, Inc. and Ski Roundtop Operating Corp. (collectively Ski Roundtop). We conclude the Superior Court erred in failing to consider the evidence, specifically the expert reports, in the light most favorable to the non-moving parties, Ray M. Bourgeois and Mary Ann I. Bourgeois (collectively the Bourgeoises). Accordingly, we reverse and remand for further proceedings.

**FACTUAL AND PROCEDURAL HISTORY**

On February 17, 2013, Ray Bourgeois hyperextended his spinal cord, resulting in quadraplegia, at Roundtop Mountain Resort when the snow tube he was riding collided with a folded "deceleration mat" that the resort's employees had placed at the bottom of

the snow tubing hill to slow down snow tubing patrons and prevent them from traveling beyond the run-out area. As further factual background,[1] Ski Roundtop Operating Corporation, a wholly-owned subsidiary of Snow Time, Inc., operates Roundtop Mountain Resort in York County, Pennsylvania. Ski Roundtop's Brief at 2 n.1. In the winter season, Roundtop Mountain Resort offers skiing, snowboarding, and snow tubing. In 1995, Roundtop Mountain Resort introduced its snow tubing attraction, which it advertised as a "no experience necessary" activity. Snow tubing does not require experience because a patron cannot exercise much control over the speed, direction, or deceleration of their snow tube as it descends down the hill. Instead, a patron rides on top of an inflatable snow tube—in either a seated, feet-first position or a prone, head-first position—down the slope and the patron's speed is influenced by gravity and the conditions of the hill, similar to sledding.

Roundtop Mountain Resort's snow tubing slope is comprised of 14 adjacent lanes separated by berms, which are piles of snow that define each lane and prevent tubes traveling down one lane from crossing into adjacent lanes. Each lane terminates in a run-out area, in which the snow tubes slow down and come to a controlled stop. Beyond the run-out area, there is a "mixing area," which is where patrons who have completed the snow tubing run get out of their tubes and walk towards the exit or the lift.

Since 1995, Roundtop Mountain Resort has modified its snow tubing hill several times. In 1996-97, it extended the riding lanes and the run-out area of the hill, and it also removed the reverse incline at the end of the run-out area. Next, in 2004, it added approximately 10 to 11 feet of elevation to the top of the hill in response to its patrons'

---

[1] As we are reviewing the Superior Court's order affirming the grant of summary judgment, we view the record in the light most favorable to the Bourgeoises, the non-moving parties. *Starling v. Lake Meade Prop. Owners Ass'n, Inc.*, 162 A.3d 327, 330 n.2 (Pa. 2017). We therefore recount the facts of this case in that manner as contained in the record below.

complaints that they frequently were not reaching the bottom of the hill because it was too slow, and it again expanded the run-out area. At the time of the incident in this case, the tubing hill was approximately 800 feet long and had a vertical drop of 80 feet.

In 2007, Ski Roundtop began using deceleration mats at the bottom of the hill to stop the snow tubes before they could enter the mixing area. The deceleration mats were not always deployed; instead, when a snow tubing supervisor determined the hill was running fast, the supervisor would instruct employees to place mats at the end of the lanes. Further, the deceleration mats were actually anti-slip, anti-fatigue mats that were marketed for use in commercial kitchens and not specifically designed for use as snow tube deceleration devices. The mats had uniform, circular perforations (drainage holes) and had two distinct sides, a top side that was relatively smooth and a bottom side that was rougher with "nubs" protruding to grip the surface of the kitchen floor and prevent the mat from slipping on the floor. Roundtop Mountain Resort borrowed its first set of mats from another ski resort. Subsequently, to obtain the mats, the resort's snow tubing manager would browse the internet for mats that were similar to those already in use at the resort or would consult the resort's "food and beverage guy" to learn where he acquired the mats used in the resort's kitchen. As a result, the resort used different brands and styles of mats in the snow tubing run-out area.

Roundtop Mountain Resort employed snow tubing supervisors and "safeties" to assist its patrons and monitor the conditions of the tubing hill. At the top of the hill, the resort had signs that advised its snow tubing patrons of the speed of the hill at any given time. The speeds were classified as very slow, slow, moderate, fast, or very fast, depending on the weather and the condition of the snow on the hill. The Safety's Training Manual instructed employees at the top of the snow tubing hill: "Do not allow anyone to enter a lane if there is an obstacle in that lane. An obstacle is anything that might block

the lane, such as another tuber, articles of clothing, a loose tube, a person, chunks of snow and etcetera.  The reason is that once a person starts sliding down the hill they have no control.  So they cannot stop or turn to avoid an obstacle."  Bourgeoises' Opposition to Motion for Summary Judgment, Ex. K, R. 422a.  Similarly, affixed to each snow tube was a warning label stating:

> WARNING!!!
> SERIOUS INJURY OR DEATH <u>MAY</u> <u>RESULT</u> FROM
> TUBING
> - Do Not Use Under The Influence Of Alcohol Or Drugs.
> - Product Is Designed To Be Used On Hills With No Obstacles With Adequate Room To Stop.
> - Product Has No Steering And No Brakes.
> - Product Has the Ability To Development [sic] High Speeds On Steep Hills Under Certain Snow Condition [sic].
> . . .

*Id.*, Ex. E, R. 305a.  The Safety's Training Manual further advised employees at the bottom of the hill: "If it is a fast night, you may need to place deceleration mats down at the end of the lane to slow tubers down.  A supervisor will make the call and will inform you where to place the mat."  *Id.*, R. 423a.  Roundtop Mountain Resort did not have additional policies governing the use of deceleration mats, and it did not deploy the mats in a uniform manner, at times they were flat and at times they were folded over, "as necessary to address changing conditions on the Tubing Hill."  Ski Roundtop's Answer & New Matter, 9/29/16, at ¶ 22.

The circumstances of Mr. Bourgeois's injury follow.  On February 16, 2013, Mr. and Mrs. Bourgeois purchased a snow tubing season pass.  The reverse side of the season pass contained a release agreement, which provided that snow tubing involves "inherent and other risks that could lead to serious injury or death."  *Id.*, Ex. A, R. 95a.  It then delineated a nonexclusive number of risks, including falling out of the tube, traveling at different speeds, colliding with other tubes, people, and "man-made objects such as:

fencing, snowmaking and grooming equipment, collisions with natural objects, [and] collisions with associated equipment[.]" *Id.* The release provided that the signatory both assumed all the risks of snow tubing and released Ski Roundtop from liability. *Id.* Mr. Bourgeois skimmed the release agreement and signed it. That same day, the Bourgeoises made 16 to 20 runs down the tubing hill without incident.

In the afternoon of the next day, February 17, 2013, after completing several runs, Mr. Bourgeois rode his snow tube in a prone position, head-first down the hill. *See* Ski Roundtop's Answer & New Matter, 9/29/16, at ¶ 59 (acknowledging "Ski Roundtop permitted [Mr. Bourgeois] to proceed down the tubing hill head first."). At the end of the run, Mr. Bourgeois's tube went over a flat deceleration mat, which did not slow him down. He then collided with a second, folded mat, which caused the tube to stop abruptly. With this sudden stop of the tube, Mr. Bourgeois's momentum propelled him, while still holding on to the tube's handles to avoid falling off the tube, forward head first over the front of the tube and face down into the snow. With his head stuck in the snow, the momentum of his body carried him forward, which hyperextended his neck causing quadriplegia. Mr. Bourgeois came to a rest on his back with the snow tube upside down on his chest. As a direct result of Mr. Bourgeois's accident, Ski Roundtop performed an investigation and decided to stop using mats to assist snow tubers with deceleration. Instead, the resort decided to increase the amount of snow-making equipment near the run-out area so it could create a reverse incline to slow down riders.

On January 16, 2015, the Bourgeoises commenced this personal injury lawsuit with a writ of summons. The Bourgeoises' July 24, 2015 complaint pled claims of negligence, gross negligence, recklessness, and loss of consortium. The Bourgeoises asserted that Ski Roundtop "knew or should have known that placement of deceleration mats at the base of the run, and particularly by folding over a portion of the mat to create

a raised surface, would increase the likelihood of [a] tube making a sudden stop at a high rate of speed, which would in turn increase the risk of harm to a rider on said tube." Complaint, 7/24/15, at ¶ 23. Additionally, the Bourgeoises averred that Ski Roundtop's "conscious decision to operate the snow tubing lanes despite unsafe conditions, permitting [Mr. Bourgeois] to ride head first under the prevailing conditions, and employing inadequate deceleration methods [] created risks of harm not inherent to the activity of snow tubing, [and] directly caused the harm to [Mr.] Bourgeois." *Id.* at ¶ 69.

In its answer and new matter, Ski Roundtop admitted it used deceleration mats "as an aid to slow riders down at the base of the tubing hill as well as a means to assist in managing the manner in which riders exit the tubing hill after the completion of a tubing hill run." Answer & New Matter, 9/29/16, at ¶ 17. Further, Ski Roundtop noted its employees positioned and adjusted the mats throughout the day, including folding and unfolding them, as the conditions of the hill changed. *Id.* at ¶¶ 22, 47. Ski Roundtop acknowledged that it was "aware of other means or measures used by ski resorts to aid in controlling the speed of snow tube riders in the run-out area." *Id.* at ¶ 46. It also conceded that Mr. Bourgeois chose to ride the tube head first down the run, and Ski Roundtop "permitted" him to do so. *Id.* at ¶ 59.

After the parties completed discovery, Ski Roundtop filed a motion for summary judgment on February 14, 2017. It framed the "heart" of the case as whether its use of deceleration mats in the run-out area was negligent or grossly negligent. Mot. for Summary Judgment, 2/14/17, at ¶ 13. It offered three arguments in favor of summary judgment. First, it contended the release agreement on the season pass barred all the Bourgeoises' claims. *Id.* at ¶¶ 18-27. Second, Ski Roundtop argued there was no evidence its conduct was reckless. *Id.* at ¶ 37. Instead, Ski Roundtop claimed it "used deceleration mats as a means to avoid tuber to tuber collisions by managing, to the extent

feasible, where tubers would come to rest at the bottom of the tubing hill." *Id.* at ¶ 38. According to Ski Roundtop, this case was an "unfortunate accident," and the Bourgeoises did not present any evidence that Ski Roundtop "acted with conscious action or inaction, bordering on intent, to harm [Mr.] Bourgeois." *Id.* at ¶¶ 40-41. Third, Ski Roundtop argued the evidence was insufficient for Bourgeoises' claims against Snow Time, Inc. because there was no evidence Snow Time managed, controlled, or was involved with the day-to-day operations of the resort. *Id.* at ¶ 45-47.

In response to the motion for summary judgment, the Bourgeoises maintained Ski Roundtop had a duty to protect its patrons and prevent them from encountering the dangerous condition it created at the bottom of the hill by using folded kitchen mats as deceleration devices. Bourgeoises' Response to Motion for Summary Judgment, 3/6/17, at ¶¶ 7, 34. The Bourgeoises argued "there is clearly a question of fact for the jury as to whether [Ski Roundtop's] deliberate decision to use kitchen floor mats as a safety device to bring tube riders to a stop after they had increased the height of the hill to make the ride too fast for the amount of runout space rose to the level of gross negligence or reckless conduct." Bourgeoises' Brief in Opposition to Motion for Summary Judgment, 3/16/17, at 19. On the gross negligence claim, the Bourgeoises asserted Ski Roundtop's "conduct consisted of a complete lack of care in a series of intentional decisions that exhibited no foresight or regard for the safety of [its] patrons[.]" *Id.* at 38. Specifically, the Bourgeoises asserted Ski Roundtop "demonstrated a want of even scant care and intentional indifference as to whether by randomly folding kitchen mats, they were exposing riders to a risk of a sudden stop that could cause speeding riders to suffer a serious injury." *Id.* The Bourgeoises pointed out that Ski Roundtop's decision to permit riders to proceed down the hill in a prone position when the mats were deployed increased the risk of serious injury. *Id.* at 39. Further, the Bourgeoises noted that Ski Roundtop did

not perform any studies on the use of deceleration mats before it decided to deploy them. *Id.* at 40. Additionally, the Bourgeoises averred that the decision to fold the mats to expose the rubber traction nubs created further danger. *Id.*

On the recklessness claim, the Bourgeoises emphasized that Ski Roundtop's conduct consisted of a series of intentional decisions: it intended to make the snow tubing hill faster; it intended to use kitchen mats as deceleration devices; it intended to deploy the mats without formal policies or procedures; and it intended to fold them with the nubs exposed. *Id.* at 42. Further, the Bourgeoises averred that Ski Roundtop knew or should have known that a folded mat brought riders to a dangerous, abrupt stop because there were two publicly-available videos posted to YouTube showing patrons' tubes abruptly stopping when they encountered folded mats. *Id.* at 43. Additionally, the Bourgeoises argued Ski Roundtop had knowledge of the risk of placing an obstacle, such as a deceleration mat, in the path of a snow tube because the tube itself had a warning label stating that tubes should be used only where there are no obstacles and where there is an adequate stopping area. *Id.*

In conjunction with their response to the motion for summary judgment, the Bourgeoises submitted two liability expert reports.[2] Mark Di Nola submitted the first expert report. He had 25 years of experience conducting accident investigation and risk management in the ski insurance industry and also served as a risk management consultant in the ski industry. Di Nola Report, 3/15/17, at 2. As such, he was familiar with the National Ski Areas Association (NSAA) tubing operations resource guide and the generally accepted practices and principles for snow tubing slope design and deceleration

---

[2] The trial court previously approved the Bourgeoises' submission of liability expert reports at the time of their response to the motion for summary judgment in a case management order, to which the parties stipulated. Trial Court Case Management Order, 2/8/17, at 1.

aids, including rubber deceleration mats. *Id.* at 2-3. His opinion was that "Ski Roundtop['s] decision to use deliberately deployed folded anti-fatigue rubber mats as [] deceleration devises [sic] constitutes an extreme departure from the ordinary standards of conduct for a tubing park operator in the Commonwealth of Pennsylvania and the generally accepted practices and principles employed by the ski industry for tubing park operations." *Id.* at 40. In support of his opinion, he explained that Ski Roundtop knew that it had an inadequate run-out area to allow snow tube riders to safely stop once it increased the height of the hill. *Id.* at 25. He noted that Ski Roundtop began to use deceleration mats after it increased the height of the hill, even though it did not "consult any safety experts or conduct any safety testing as to the effect of a vinyl snow tube coming into contact with a deliberately deployed folded anti-fatigue rubber mat[,]" which was not designed for use on a snow tubing course. *Id.* at 27, 29, 38. He also provided several options that Ski Roundtop had to mitigate the increased risk of serious injury, such as using hay, pea stone, snow grooming, snowmaking, lowering the starting point of the runs, or extending the run-out area. *Id.* at 30. In his opinion, the conscious decision to use rubber mats exposed snow tube riders to an increased risk of injury beyond the inherent risks of snow tubing, a risk which Ski Roundtop did not identify. *Id.* at 25, 38, 41. Further, to show "Ski Roundtop knew or should have known of the increased risk of serious injury to its guest caused by its decision to deliberately deploy folded anti-fatigue rubber [mats] as deceleration devices," he identified the deposition of a Roundtop Mountain Resort safety, who testified that he witnessed "a few instances" of a tube being brought to a sudden stop when hitting a folded mat, and two YouTube videos of snow tubers at Roundtop Mountain Resort encountering folded mats and nearly flipping over. *Id.* at 9, 22-23. Additionally, he noted Ski Roundtop's use of deceleration mats "directly violated the manufacturer's warning label by using the tubes on a hill with deliberately

placed obstacles[.]" *Id.* at 41. Therefore, Di Nola concluded that Ski Roundtop's conscious decisions "increased the risk of serious injury to riders over and above those inherent in the activity of snow tubing in [] Pennsylvania and constitute an extreme departure from the ordinary standards of conduct for a ski area[.]" *Id.*

The Bourgeoises' second liability expert, Gordon Moskowitz, performed a biomechanical incident analysis and concluded Mr. Bourgeois's collision with the folded deceleration mat caused his injuries. Moskowitz Report, 3/14/17, at 1. Moskowitz explained that a snow tube's speed is affected largely by the coefficient of friction of the hill's snow, which is influenced by how much water film is on the surface and changes with the snow's temperature. *Id.* at 7-8. The coefficient of friction is highest when the snow's temperature is above freezing because there is a "thick and continuous" water film on the surface, while it is at its lowest when the temperature is below freezing because there is a limited water film. *Id.* at 8. Moskowitz calculated that without friction, Mr. Bourgeois's "theoretical speed at the bottom [of the 800-foot snow tubing run] would have been approximately 49 miles per hour. Of course, if friction is taken into account Mr. Bourgeois' maximum speed could have been approximately 35 miles per hour at the end of his run[.]" *Id.* Based on the weather conditions and the resulting coefficient of friction on February 15 and 16, 2013, Moskowitz concluded that a snow tube would have stopped at or short of 800 feet. *Id.* at 9. However, on February 17, 2013, the "conditions would have permitted him to achieve a maximum speed approaching 35 miles per hour as he arrived at the end of the run at 800 feet[,]" but "[v]ariations in the coefficient of friction, irregularities on the slope surface and several horizontal sections would have limited his final speed closer to 30 miles per hour" when he collided with the deceleration mat. *Id.* at 10. Analyzing photographs of the mats taken shortly after Mr. Bourgeois's accident, Moskowitz noted they were folded so that the nubs on the bottom of the mats would

contact any tube traveling over the mats. *Id.* at 13. Based on his testing of five exemplar kitchen mats, he opined that "Roundtop knew or should have known that tubers traveling at a high rate of speed would find their tube brought to an abrupt stop when it encountered a folded mat, with that risk increasing further when the mat was folded with the nubs exposed to the bottom of the tube." *Id.* at 16. He concluded that several factors combined to cause Mr. Bourgeois's injury: the high speed of the hill, Mr. Bourgeois's height, his weight, his prone riding position, his position at the point of impact with his head directly over the fold of the mat, and the "style and positioning of the folded deceleration mat . . . with its nubs exposed to the bottom of the tube." *Id.* at 17.

Ski Roundtop did not submit any competing expert reports in support of its motion for summary judgment.

On June 19, 2017, the trial court granted Ski Roundtop's motion for summary judgment. The trial court noted summary judgment is proper only when the record contains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Trial Ct. Op., 6/19/17, at 3. The moving party has the burden to prove the absence of genuine issues of fact, and the court must resolve any doubts regarding the existence of a genuine issue of material fact against the moving party. *Id.* at 4. Further, the non-moving party must produce evidence, beyond mere pleadings, on issues on which the non-moving party has the burden of proof to withstand summary judgment. *Id.*

The trial court first held that the release agreement on the snow tubing season pass barred the Bourgeoises' negligence claims because the exculpatory provision was valid, enforceable, and sufficiently conspicuous.[3] *Id.* at 5-13.

---

[3] The Bourgeoises did not appeal this aspect of the trial court's decision, and it is outside the scope of the issues we granted allowance of appeal to consider.

Next, the trial court concluded the Bourgeoises did not produce sufficient evidence to show Ski Roundtop's conduct was reckless. *Id.* at 20. The trial court set forth the definition of reckless disregard of safety contained in Section 500 of the Restatement (Second) of Torts:

> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

*Id.* at 14 (quoting RESTATEMENT (SECOND) OF TORTS § 500). The court explained that the distinguishing feature of reckless conduct is the actor's conscious action or inaction, as opposed to negligent conduct that is more akin to an actor's unconscious inadvertence. *Id.* Further, the trial court noted that an exculpatory release cannot preclude claims of recklessness. *Id.* at 14 (applying *Tayar v. Camelback Ski Corp., Inc.*, 47 A.3d 1190, 1201-02 (Pa. 2012)).

The trial court acknowledged that the Bourgeoises' main theory of recklessness was that Ski Roundtop "consciously decided to place and fold deceleration mats at the bottom of the hill, knowing that folding the mats would create a risk of bringing tubers to a dangerously fast stop[,] creat[ing] an unreasonable risk of physical harm to [Bourgeois]." *Id.* at 17. However, the trial court concluded Ski Roundtop's conduct was not reckless because Ski Roundtop intended for the deceleration mats to prevent snow tubers from traveling beyond the run-out area and colliding with other objects or snow tubing patrons. *Id.* Further, the trial court dismissed the Bourgeoises' contentions that Ski Roundtop did not conduct studies or enact policies regarding the use of deceleration mats because the Bourgeoises did not produce evidence of an industry standard for the placement or use

of deceleration mats. *Id.* at 18. To the trial court, the lack of an industry standard meant that Ski Roundtop did not know that using mats to stop snow tubers in the run-out area introduced an unreasonable risk of harm as compared to placing the mats in a different manner, using a different type of mat, or using an entirely different method to stop snow tubers. *Id.* at 18-19 (distinguishing *Feleccia v. Lackawanna Coll.*, 156 A.3d 1200 (Pa. Super. 2017)). Lastly, the trial court found the Bourgeoises did not provide evidence that Ski Roundtop had actual knowledge from a prior accident or an employee's observation that folding the mats increased the risk of harm to its snow tubing patrons. *Id.* at 19. Due to the lack of evidence on these points, the trial court held Ski Roundtop did not act in reckless disregard of Mr. Bourgeois's safety and granted summary judgment in favor of Ski Roundtop on the Bourgeoises' recklessness claims. *Id.* at 20.

The trial court similarly concluded the Bourgeoises did not produce sufficient facts to show Ski Roundtop's conduct was grossly negligent. *Id.* The court noted that grossly negligent conduct flagrantly departs from the ordinary standard of care. *Id.* Further, even though it is presumptively the jury's function to evaluate the evidence and decide whether an act or failure to act is negligent, the trial court explained a case cannot reach the jury when it is "entirely free from doubt that the conduct in question falls short of gross negligence and no reasonable jury could find that the facts constitute gross negligence." *Id.* at 20-21. The trial court did not analyze the then-unresolved question of whether an exculpatory clause can preclude liability for gross negligence because it found the record did not contain sufficient facts that would enable a reasonable jury to find Ski Roundtop's conduct was grossly negligent.[4] *Id.* at 22. Specifically, the trial court faulted the Bourgeoises for not introducing any evidence of directives that Ski Roundtop's employees

---

[4] This Court has since held that waivers are not enforceable as to claims of gross negligence. *Feleccia v. Lackawanna Coll.*, 215 A.3d 3, 21 (Pa. 2019).

violated when they placed folded deceleration mats at the bottom of the hill. *Id.* at 22-23. Further, the trial court found Ski Roundtop placed the mats in the run-out area with the intention of protecting its patrons from harm, and the Bourgeoises' evidence did not show that Ski Roundtop "deviated from the standard of care by folding the mats, having an inadequate or overabundant amount of mats, or that the placement of mats was not according to the standard of care." *Id.* at 23. Accordingly, the trial court held there was no evidence from which a reasonable jury could conclude Ski Roundtop's act of folding the deceleration mats grossly deviated from the standard of care and granted summary judgment in favor of Ski Roundtop on the claims of gross negligence. *Id.* Notably absent from the trial court's discussion of the insufficiency of the Bourgeoises' evidence to show recklessness or gross negligence was any mention of either expert report that the Bourgeoises submitted with their response to the motion for summary judgment. The Bourgeoises appealed.

The Superior Court affirmed in a 2-1 non-precedential memorandum decision. The Superior Court focused on the Bourgeoises' allegation that Ski Roundtop's deployment of deceleration mats at the end of its snowtubing run was grossly negligent or reckless. *Bourgeois v. Snow Time, Inc.*, No. 1086 MDA 2017, 2018 WL 3868670, at *4 (Pa. Super. Aug. 14, 2018); *see also id.* at *4 n.4 (finding the Bourgeoises narrowed their theory of the case on appeal and did not pursue the claim that Ski Roundtop did not provide its customers an adequate distance for stopping or decelerating). Relevant to this appeal, the Superior Court held that the Bourgeoises "did not establish a *prima facie* claim for recklessness or gross negligence." *Id.* at *2. The court reasoned the Bourgeoises "failed to articulate the appropriate standard of care for the use of deceleration mats[,]" without which they could not "establish [Ski Roundtop's] duty to [the Bourgeoises] and that [Ski Roundtop] knew or should have known about the standard of care." *Id.* at *5.

The Superior Court acknowledged that a jury should generally determine whether a party's conduct was grossly negligent, but on a motion for summary judgment "a court may decide the question as a matter of law where the case is entirely free from doubt and there is no possibility that a reasonable jury could find gross negligence." *Id.* at *4 (citing *Colloi v. Phila. Elec. Co.*, 481 A.2d 616, 621 (Pa. Super. 1984)). Further, in reciting the standard for summary judgment, the Superior Court explained that a trial court must defer to a non-moving party's expert as long as the report's conclusions are "sufficiently supported, [and] the trial judge cannot *sua sponte* assail them in an order and opinion granting summary judgment." *Id.* at *3 (quoting *Summers v. Certainteed Corp.*, 997 A.2d 1152, 1159 (Pa. 2010)). However, the Superior Court did not address the trial court's failure to discuss the Bourgeoises' experts' reports. Instead, the court conducted its own review of the experts' reports and concluded neither expert established the standard of care. *Id.* at *4.

Specifically, the Superior Court premised its analysis on the principle that expert testimony is generally required to define a defendant's duty and the standard of care. *Id.* (citing *Toogood v. Owen J. Rogal, D.D.S., P.C.*, 824 A.2d 1140, 1145 (Pa. 2003) (stating that a plaintiff in a medical malpractice action must present expert testimony to establish the standard of care, breach of the standard, causation, and harm "[b]ecause the negligence of a physician encompasses matters not within the ordinary knowledge and experience of laypersons"); *Truax v. Roulhac*, 126 A.3d 991, 997-99 (Pa. Super. 2015) (en banc) (concluding proffered expert in a premises liability action could enable a jury to find the harm to the plaintiff was foreseeable, but explaining an expert was not necessary); *Zokaites Contracting Inc. v. Trant Corp.*, 968 A.2d 1282, 1287 (Pa. Super. 2009) (outlining that expert testimony is generally required in a professional negligence action "because the negligence of a professional encompasses matters not within the ordinary knowledge

and experience of laypersons.")). According to the Superior Court, the parties in this case agreed that the Bourgeoises were required to present an expert to establish the standard of care. *Id.* at *4 n.3.

Reviewing the experts' reports, the court concluded that both of the Bourgeoises' experts failed to describe the standard of care and, in turn, the duty of Ski Roundtop. *Id.* at *4. The Superior Court found Di Nola's report was insufficient to establish the standard of care because it generally concluded that Ski Roundtop's "'decision to use deliberately deployed folded anti-fatigue rubber mats as a deceleration device constitutes an extreme departure from the ordinary standards of conduct for a tubing park operator.'" *Id.* at *5 (quoting Di Nola Report, 3/15/17, at 40). In the Superior Court's view, the general reference to "ordinary standards of conduct for a tubing park operator" did not adequately articulate the standard of care. Additionally, the Superior Court dismissed Di Nola's citation of the National Ski Areas Association's "Tubing and Operations Resource Guide" because the court found the NSAA's guide does not address the use of mats as deceleration devices; instead, its standard of care addresses the length of a tubing run-out area. *Id.*; *see also id.* at *5 n.5 (noting Di Nola states the NSAA outlines "guidelines," and it is unclear whether he relies on the NSAA guide to establish a standard of care). Accordingly, the Superior Court concluded Di Nola's report did not establish a standard of care because it contained only bald conclusions that he did not sufficiently support. *Id.* at *5.

Likewise, the court found Moskowitz's report did not attempt to set forth any standards of care. *Id.* Therefore, the court concluded Moskowitz's report was "not relevant to the determination of whether [Ski Roundtop] engaged in reckless or grossly negligent conduct in failing to meet a standard of care by using folded rubber mats in the deceleration area." *Id.* Based on its review of the experts' reports, the Superior Court

held the Bourgeoises did not establish the standard of care for the use of deceleration mats. *Id.* Because the court found the Bourgeoises failed to define the standard of care, it concluded that, as a matter of law, the Bourgeoises could not establish Ski Roundtop's duty or that Ski Roundtop knew or should have known about the standard of care. *Id.* Therefore, the Superior Court affirmed the trial court order granting summary judgment in favor of Ski Roundtop. *Id.*

Judge Strassburger filed a dissenting memorandum in which he opined that summary judgment was improper because a reasonable jury could find Ski Roundtop's conduct was grossly negligent and/or reckless. *Id.* at *6 (Strassburger, J., dissenting). He reiterated the principle that a trial court evaluating a motion for summary judgment must view the facts, and all reasonable inferences, in a light most favorable to the non-moving party, which includes expert reports. *Id.* at *9. A trial court's failure to consider the non-moving party's expert reports is error because it reflects that the trial court did not evaluate all the evidence in a light most favorable to the non-moving party. *Id.* (citing *Greely v. W. Penn Power Co.*, 156 A.3d 276, 282-84 (Pa. Super. 2017)). Despite this standard, Judge Strassburger noted "[t]he [m]ajority simply ignores the trial court's failure to consider Appellants' expert reports and undergoes its own analysis of the reports." *Id.* Judge Strassburger maintained that the Bourgeoises' expert reports were sufficient to enable a reasonable jury to find Ski Roundtop was grossly negligent and reckless:

> Woven throughout the reports are detailed references to the way that [Ski Roundtop] grossly deviated from the standard of care. One cannot seriously dispute that Appellees owe their patrons, who are riding on a vinyl tube without a steering or stopping mechanism down a steep snow-covered hill on a course that Appellees designed, a duty to ensure that the patrons are able to stop safely without serious injury at the bottom. One hardly needs an expert to establish that placing a stationary object, which is designed for an entirely different use, in the path of a fast-traveling snow tube rider in the hopes of slowing down the rider could instead, under certain

foreseeable conditions, cause the rider to stop abruptly and eject the rider in a manner resulting in serious injury. This is particularly the case when Appellees have not conducted or reviewed studies to determine the effect of placing the mat in the rider's path under various conditions. Further, a jury could find that [the] risk of serious injury was substantially increased without a standardized method to measure riders' specific speeds, assess conditions, or arrange the mats. Moreover, not only were the mats used by Appellees not designed for the purpose for which Appellees used them, they used the snow tubes in a manner that was contradicted expressly by the warning on the label – a label, by the way, which was illegible on [Mr. Bourgeois's] tube.

*Id.* at 10. Further, Judge Strassburger disagreed with the trial court's and majority's sole focus on the use of folded mats because the Bourgeoises' claims set forth numerous other facts that Ski Roundtop knew or should have known, including the conditions of the snow tubing course resulting in riders traveling as fast as 30-35 miles per hour, the risk of serious injury when a fast-moving snow tube collides with a stationary object, the insufficient run-out area, and the use of mats that were not designed to stop a snow tube. *Id.* (citing Bourgeoises' Superior Court Brief at 45-47). Accordingly, he concluded that he would reverse the trial court's grant of summary judgment because a reasonable jury could have found that the combination of Ski Roundtop's conscious decisions created an unreasonable risk of physical harm substantially greater than ordinary negligence. *Id.*

**ISSUES AND STANDARD OF REVIEW**

We granted the Bourgeoises' petition for allowance of appeal to consider the following issues:

> (1) Did the majority panel opinion conflict with existing law by failing to address the trial court's disregard of Petitioners' expert reports when granting summary judgment?
>
> (2) Did the majority panel opinion conflict with existing law requiring it to review Petitioners' expert reports in the light most favorable to the non-moving party by, inter alia, (a) improperly requiring Petitioners' experts to establish the legal duty that Respondents breached, (b) dismissing their opinions

as conclusory, and (c) overlooking numerous opinions throughout their reports which supported Petitioners' prima facie case against Respondents?

(3) Did the majority panel opinion conflict with existing law when it held that Petitioners did not establish the duties Respondents owed to Petitioners, when the duty of a snow tubing facility to protect its patrons from unreasonable risks of harm has already been established by the Supreme Court in *Tayar v. Camelback* [47 A.3d 1190 (Pa. 2012)]?

(4) Did the majority panel opinion conflict with existing law by requiring that a violation of industry standards be demonstrated for Petitioners to sustain a recklessness or gross negligence cause of action against Respondents?

*Bourgeois v. Snow Time, Inc.*, 215 A.3d 967 (Pa. 2019) (per curiam).

In reviewing a grant of summary judgment, this Court's standard of review is de novo and our scope of review is plenary. *Pyeritz v. Commonwealth of Pa., State Police Dep't*, 32 A.3d 687, 692 (Pa. 2011). A trial court should grant summary judgment only in cases where the record contains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Summers v. Certainteed Corp.*, 997 A.2d 1152, 1159 (Pa. 2010). The moving party has the burden to demonstrate the absence of any issue of material fact, and the trial court must evaluate all the facts and make reasonable inferences in a light most favorable to the non-moving party. *Id.* The trial court is further required to resolve any doubts as to the existence of a genuine issue of material fact against the moving party and "may grant summary judgment only where the right to such a judgment is clear and free from doubt." *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 195 (Pa. 2007). This Court has held that the summary judgment standard that a trial court must view the facts, and all reasonable inferences, in a light most favorable to the non-moving party "clearly includes all expert testimony and reports submitted by the non-moving party or provided during discovery; and, so long as the conclusions contained within those reports are sufficiently supported, the trial judge cannot *sua sponte* assail

them in an order and opinion granting summary judgment." *Summers*, 997 A.2d at 1161. An appellate court may reverse a grant of summary judgment only if the trial court erred in its application of the law or abused its discretion. *Id.* at 1159.

# I

## A. PARTIES' ARGUMENTS

In their first issue, the Bourgeoises contend the trial court's failure to consider their expert reports in deciding the motion for summary judgment warrants reversal on its own. Bourgeoises' Brief at 30. They highlight that in *Summers* this Court explained that a trial court is required to evaluate a non-moving party's expert report in a light most favorable to the non-moving party, as long as the expert's conclusions are sufficiently supported. *Id.* at 30-31 (discussing *Summers*, 997 A.2d at 1161). Likewise, the Bourgeoises point to *Greely v. West Penn Power Co.*, 156 A.3d 276 (Pa. Super. 2017), in which the Superior Court held that the trial court's failure to consider the non-moving party's expert report was reversible error because it showed that the trial court did not view the evidence in a light most favorable to the non-moving party. *Id.* at 33.

In this case, the Bourgeoises maintain the trial court erred because its opinion accompanying the order granting summary judgment did not reflect its consideration of their expert reports. *Id.* Moreover, in response to the Bourgeoises' Pa.R.A.P. 1925(b) statement of matters complained of on appeal, which raised the issue, the trial court did not issue a clarifying Rule 1925(a) opinion as to whether it considered the expert reports. *Id.* at 34. The Bourgeoises find this particularly problematic because their expert reports addressed the factual deficiencies that the trial court relied on to grant summary judgment.[5] *Id.* Compounding the trial court's error, according to the Bourgeoises, was

---

[5] The amicus curiae brief of the Pennsylvania Association of Justice (PAJ) similarly argues the trial court misapplied the summary judgment standard by failing to view the

that the Superior Court's opinion did not address the trial court's failure to consider the expert reports, but reached the unsupported conclusion that the trial court considered the expert reports and concluded they did not articulate a standard of care. *Id.* at 33 (quoting *Bourgeois*, 2018 WL 3868670, at *4). In response to the Superior Court's reasoning, the Bourgeoises argue that the Superior Court cannot assume the trial court considered evidence that it did not mention anywhere in its written opinion. Therefore, the Bourgeoises conclude we should reverse the Superior Court because it erred in excusing the trial court's failure to view the evidence, including the expert reports, in the light most favorable to the non-moving party. *Id.* at 34-35.

Ski Roundtop responds that the trial court indicated it considered the entire record in the light most favorable to the Bourgeoises and concluded the evidence was insufficient to support claims of gross negligence or recklessness. Ski Roundtop's Brief at 13-14. Ski Roundtop maintains the trial court's accurate recitation of the summary judgment standard is sufficient to sustain its grant of summary judgment. *Id.* at 15. Responding to the Bourgeoises' contention that the trial court must specifically discuss the expert reports, Ski Roundtop argues expert reports do not necessarily have any more weight or relevance than other evidence, and the Bourgeoises are not contending the trial court erred in failing to list each deposition transcript or document it reviewed. *Id.* at 15-16.

Additionally, Ski Roundtop asserts that the trial court's opinion shows that it did consider the expert reports in concluding the Bourgeoises did not produce evidence of an industry standard governing the use of mats at the base of the hill. *Id.* at 16-17. Ski Roundtop notes the trial court addressed all of the theories of recklessness or gross negligence in the expert reports by concluding that Ski Roundtop's conduct in using folded

---

evidence in a light most favorable to the Bourgeoises. Amicus Curiae Brief at 10. PAJ contends this alone warrants reversal. *Id.* at 16.

deceleration mats was not reckless, the lack of any standard governing the use of folded mats negated Ski Roundtop's actual knowledge of the danger they posed, and the lack of evidence of other accidents or an employee's observation that folded mats increased the risk of harm showed Ski Roundtop did not have constructive knowledge. *Id.* at 20-21. Accordingly, Ski Roundtop concludes the trial court considered the entire record in granting summary judgment on the gross negligence and recklessness claims.

Ski Roundtop then contends that the Superior Court did not err in failing to reverse the trial court for not considering the expert reports. *Id.* at 24. Ski Roundtop frames the Bourgeoises position as requiring the trial court to defer to expert reports submitted in opposition to a motion for summary judgment. *Id.* Ski Roundtop contends *Summers* does not require absolute deference to expert reports, but gives the trial court discretion to reject an expert whose conclusions are not sufficiently supported. *Id.* at 25-27. In this case, Ski Roundtop claims the trial court properly determined the facts were not sufficient to support the claims of gross negligence or recklessness, and the Superior Court concluded the same after analyzing the expert reports. *Id.* at 29-30. Accordingly, Ski Roundtop maintains the trial court and the Superior Court properly applied the law and should be affirmed. *Id.* at 41.

In their reply brief, the Bourgeoises emphasize that the reversible error is that the expert reports contained facts and opinions that directly contradicted the trial court's factual conclusions, such as the trial court's finding that there was no evidence that Ski Roundtop knew or should have known that using folded mats was dangerous. *Id.* at 4. Contrary to the trial court's finding, the Bourgeoises assert both expert reports discussed publicly-available YouTube videos that refuted Ski Roundtop's contention that it was not aware of prior incidents with folded mats. *Id.* at 5-6. Because the expert reports disputed

the trial court's factual findings, the Bourgeoises argue the trial court must not have considered them or assumed the role of a factfinder and rejected them. *Id.*

Responding to Ski Roundtop's argument that a trial court does not have to itemize all the evidence it considers, the Bourgeoises assert that the issue here is not merely a failure to consider evidence, but the failure to consider evidence that shows disputed material facts. *Id.* at 7. They maintain the expert reports, which contained witnesses' deposition testimony, Roundtop Mountain Resort's training manual, and the snow tube's warning label, showed Ski Roundtop had actual and constructive knowledge of the dangers of their conduct. *Id.* The Bourgeoises also emphasize that they do not contend that Ski Roundtop intended to injure Mr. Bourgeois, but a number of its intentional acts resulted in injury. *Id.* at 9-10. The Bourgeoises argue that Ski Roundtop's intent to injure argument is misplaced because the intent to injure is not an element of gross negligence or recklessness. *Id.* at 11-12.

## B. ANALYSIS

The Superior Court, in conclusory manner, presumed the trial court considered the Bourgeoises' expert evidence when it ruled on Ski Roundtop's motion for summary judgment. *Bourgeois,* 2018 WL 3868670, at *4 ("we agree with the trial court that [the Bourgeoises] failed to provide an expert report that articulated a relevant standard of care."). This Court has held that the summary judgment standard requires a trial court to view the non-moving party's expert reports, and all reasonable inferences, in a light most favorable to the non-moving party, and the trial court cannot "*sua sponte* assail them" if their conclusions are "sufficiently supported[.]" *Summers*, 997 A.2d at 1161. *Summers* was an asbestos action in which the plaintiffs' expert testified that the plaintiffs' occupational exposure to asbestos caused their injuries. *Id.* In affirming the trial court order granting summary judgment, the Superior Court rejected the expert's causation

opinion because the plaintiffs had multiple medical conditions that, in the Superior Court's opinion, rendered a causation determination impossible. *Id.* at 1158. This Court reversed the Superior Court because it erroneously "overlooked" the expert's conclusion on causation, which we found was supported by the record. *Id.* at 1161; *accord Greely*, 156 A.3d at 283 (holding the trial court opinion's failure to consider an expert report shows the trial court did not view the evidence in a light most favorable to the non-moving party). The *Summers* Court further explained that the parties disputed the issue of proximate cause, but it concluded that issue should be decided by a jury and stated it was error for the trial court and the Superior Court to reject the expert's conclusions on summary judgment. *Summers*, 997 A.2d at 1161-62.

Applying *Summers* to this case, we conclude the Superior Court erred in excusing the trial court's failure to view the experts' conclusions in the light most favorable to the Bourgeoises. The trial court's written opinions explaining its conclusion that the Bourgeoises did not produce sufficient evidence to show gross negligence or recklessness completely lacked any discussion or citation of the reports. The trial court's failure to consider the experts' reports is also evidenced by its conclusion that the lack of evidence on gross negligence and recklessness was dispositive even though the expert reports raised genuine issues of material fact on those claims for a jury to resolve.[6]

---

[6] Specifically, the Bourgeoises' experts directly contradicted the trial court's conclusion that the Bourgeoises did not introduce any evidence to support their gross negligence claim. *Compare* Trial Ct. Op., 6/19/17, at 22-23 (concluding the Bourgeoises did not introduce evidence Ski Roundtop's employees violated any directives when they placed folded deceleration mats at the bottom of the hill), *with* Di Nola Report, 3/15/17, at 26-28, 41 (citing Ski Roundtop's noncompliance with the NSAA guidelines and the snow tube manufacturer's label and concluding Ski Roundtop had an "operationally reckless company policy"); *compare* Trial Ct. Op. at 23 (finding Ski Roundtop did not deviate from the standard of care in the placement or folding of the mats), *with* Moskowitz Report, 3/14/17, at 16-17 (opining the style and positioning of the folded mat was a contributing factor in Mr. Bourgeois's injury), *and* Di Nola Report at 40 (containing numerous

We disagree with Ski Roundtop's argument that the trial court's opinion reflects its consideration of the expert reports. While Ski Roundtop is correct that the trial court accurately recited the summary judgment standard, its application of that standard was erroneous. Additionally, Ski Roundtop's contention that an expert report does not carry more weight or relevance than any other evidence is not persuasive when the expert

allegations of how Ski Roundtop's conduct was an "extreme departure from the ordinary standards of conduct for a tubing park operator.").

Similarly, the trial court's findings regarding the insufficiency of the evidence for recklessness was also at variance with the expert reports. *Compare* Trial Ct. Op. at 17 (concluding Ski Roundtop's intent in placing the mats was to prevent snow tubers from traveling beyond the run-out area and colliding with other objects or patrons), *with* Di Nola Report at 38 (opining Ski Roundtop intentionally deployed folded mats with, among other things, the knowledge there had been no safety testing, the knowledge of their decision to increase the height and speed of the hill without a sufficient run-out area, and the knowledge that folded mats did not mitigate the increased risk of serious injuries), *and* Moskowitz Report at 16 (concluding Ski Roundtop knew or should have known that a folded mat with its nubs facing up increased the risk of an abrupt stop); *see also* RESTATEMENT (SECOND) OF TORTS § 500 cmt. f (explaining a reckless actor does not intend to cause the harm, but realizes or should realize "there is a strong probability that harm may result, even though [the actor] hopes or even expects that [the] conduct will prove harmless."); Ski Roundtop's Mot. for Summary Judgment, 2/14/17, ¶ 38 (admitting it intentionally placed deceleration mats at the bottom of the tubing runs and intended for snow tubers to contact them when they were going too fast to remain within the run-out area). *Compare* Trial Ct. Op. at 18 (finding the Bourgeoises' failure to show an industry standard for the use of deceleration mats meant that Ski Roundtop did not have actual knowledge that using the folded mats created an unreasonable risk of harm), *with* Moskowitz Report at 16 (showing Ski Roundtop should have known of the unreasonable risk of harm if it had performed a safety study on the use of folded mats to stop snow tubes traveling at the speeds its hill was capable of generating), *and* Di Nola Report at 40 (concluding, based on his 25 years of experience in the industry, Ski Roundtop's intentional use of deceleration mats was an "extreme departure" from industry standards that "created a substantial risk of harm to its tubing patrons."); *compare* Trial Ct. Op. at 19 (finding the Bourgeoises failed to produce evidence of a prior accident or an employee's observation to show Ski Roundtop's actual knowledge that folding the mats increased the risk of harm), *with* Di Nola Report at 22-23 (analyzing two publicly-available YouTube videos that showed two incidents of other Ski Roundtop tubing patrons hitting a folded deceleration mat), *and id.* at 9 (discussing the deposition testimony of one of Ski Roundtop's safeties, who "testified he previously witnessed a tube being brought to a sudden stop when encountering a folded mat in '[a] few instances.'").

reports here showed there were genuine issues of material fact that directly contradicted the facts the trial court found dispositive. Even though the trial court addressed the theories of recklessness and gross negligence, it did not do so in a light most favorable to the Bourgeoises. As discussed above, both expert reports presented genuine issues of material fact supported by the record for a jury to resolve, and the trial court erred in not considering them.

Because the trial court erred in not considering the expert reports, the Superior Court erred in not reversing the trial court on this basis and instead condoning the trial court's misapplication of the summary judgment standard by *sua sponte* rejecting the experts. *See Summers*, 997 A.2d at 1162 (concluding "it was error for the courts below to reject [the expert's] conclusions at the summary judgment stage."). Therefore, we conclude both the trial court and the Superior Court erred as a matter of law in the application of the summary judgment standard that requires a court to view all of the evidence, and all reasonable inferences, in the light most favorable to the non-moving parties. As addressed in the next issues, the Superior Court compounded this error by assuming the trial court had considered the expert reports and *sua sponte* assailing the experts for not defining Ski Roundtop's duty or the standard of care.

## II

## A. PARTIES' ARGUMENTS

The Bourgeoises' remaining issues challenge the Superior Court's reasoning, and we address them together because they are interrelated. The Bourgeoises argue the Superior Court's independent analysis of the expert reports was erroneous because it did not view the reports in the light most favorable to the non-moving party. Bourgeoises' Brief at 35. The Bourgeoises fault the Superior Court for focusing on whether the experts established a standard of care instead of on whether the experts showed Ski Roundtop

breached the standard of care. *Id.* The Bourgeoises maintain that an expert is not required to establish the duty owed to a plaintiff when that duty is within the comprehension of a layperson. *Id.* at 36-37. The Bourgeoises note that the Superior Court relied on cases involving professional negligence claims in stating that expert testimony is "often" required to establish the standard of care, but the court did not state why expert testimony is necessary in this case. *Id.* at 38. Further, the Bourgeoises dispute the Superior Court's statement that they agreed that an expert was needed to define the standard of care. *Id.* at 39.

The Bourgeoises state that "the duty of care of a commercial snow tubing facility to its patrons is to protect them from unreasonable risks of harm[.]" *Id.* The Bourgeoises argue the Superior Court erred in concluding that they did not establish the duty Ski Roundtop owed to its snow tubing patrons for two reasons. First, they assert Ski Roundtop's affirmative conduct of modifying its hill to increase the speed of the ride and of deploying folded kitchen mats as deceleration aids placed it under a duty to exercise reasonable care for that affirmative conduct. *Id.* at 46 (citing *Feleccia*, 215 A.3d at 14 (recognizing an actor has a duty to exercise reasonable care to protect others from an unreasonable risk of harm arising out of the actor's affirmative acts); RESTATEMENT (SECOND) OF TORTS § 323 (providing that a person who undertakes a duty is liable for physical harm resulting from the failure to exercise reasonable care in performing the undertaking)). Second, the Bourgeoises contend that Ski Roundtop had a duty to protect its patrons from dangerous conditions on its land by virtue of its status as a landowner who opened its property to the public for commercial activities. *Id.* at 47 (citing RESTATEMENT (SECOND) OF TORTS § 343; *Truax*, 126 A.3d at 998). The Bourgeoises maintain they provided evidence to establish Ski Roundtop's duty as a landowner: Ski Roundtop knew or should have known of the dangers the folded mats created because

the tubes' warning labels and its training manual cautioned against obstacles and mandated adequate stopping room; Ski Roundtop knew that Mr. Bourgeois could not protect himself from this danger because, as recognized in its training manual, a snow tuber has no control over their tube; and Ski Roundtop did not protect Mr. Bourgeois from the dangerous conditions they created and intended for him to encounter. *Id.* at 48. Further, the Bourgeoises assert that the Superior Court recognized that a commercial snow tubing facility has a duty to protect its patrons from unreasonable risks of harm. *Id.* at 49 (discussing *Tayar*, 957 A.2d at 291). Ski Roundtop's duty, according to the Bourgeoises, is the same for claims of negligence, gross negligence, and recklessness, and expert testimony is not required to establish it. *Id.* at 49. Therefore, the Bourgeoises conclude the Superior Court erred in holding they failed to establish the duty Ski Roundtop owed to them. *Id.* at 49-50.

Additionally, the Bourgeoises argue the Superior Court erred in dismissing their experts' opinions as conclusory. Addressing the Superior Court's reasoning that their experts did not cite to industry standards specific to folded kitchen mats, the Bourgeoises note Di Nola's report included standards cautioning against placing obstacles in a snow tube's path, and Moskowitz's analyzed the effect of a snow tube's collision with a folded mat.[7] *Id.* at 40. Alternatively, the Bourgeoises note that an expert's opinion may be based entirely on the expert's experience in the industry, and Di Nola's conclusion that Ski

---

[7] Amicus PAJ also notes that an expert report is not necessary to establish a prima facie claim of gross negligence or recklessness. Amicus Curiae Brief at 17. It distinguishes this case from a professional negligence action, in which expert testimony is necessary to assist the jury in evaluating technical issues outside of the knowledge and experience of laypersons. *Id.* at 19-22. PAJ finds the Superior Court's dismissal of the expert reports on the grounds they did not specify an industry standard governing the use of deceleration mats is problematic because Ski Roundtop's corporate designee, Lionel Whitcomb, admitted there is no such industry standard for using deceleration mats. *Id.* at 14-15.

Roundtop's conduct was an "extreme" departure from accepted industry practices was thus sufficient to support the claims of gross negligence and recklessness. *Id.* at 41-42.

Lastly, the Bourgeoises argue that the Superior Court's narrow focus on the industry standard governing the use of folded mats caused it to overlook Ski Roundtop's numerous other intentional decisions that contributed to Mr. Bourgeois's injuries, such as adding height and speed to the tubing hill, remaining open for business during fast conditions, and providing Mr. Bourgeois with a tube that was not designed to encounter obstacles. *Id.* at 42. To the extent the Superior Court's opinion imposed a requirement to identify industry standards, the Bourgeoises assert the causes of action for gross negligence or recklessness do not require a plaintiff to cite industry standards. *Id.* at 50. Additionally, the Bourgeoises assert that compliance with industry standards does not shield a party from liability for not exercising due care. *Id.* at 60 (quoting *Berkebile v. Brantly Helicopter Corp.*, 281 A.2d 707, 710 (Pa. Super. 1971) (en banc) (explaining "[c]ompliance with a law or administrative regulation relieves the actor of negligence per se, but it does not establish as a matter of law that due care was exercised.")).

As a practical matter, the Bourgeoises question how an industry standard can exist for a product that was not designed for use in the industry. *Id.* at 44. To illustrate this concern, the Bourgeoises posit that if Ski Roundtop had used spare bags of rock salt instead of folded mats to stop snow tubes, there similarly would have been no identifiable industry standard. *Id.* at 44 & n.11. Further, the Bourgeoises highlight that Di Nola's report showed how Ski Roundtop violated industry standards by citing the NSAA's recommendation that a snow tube run out must be 1.25 times as long as the ride, the manufacturer's warning label stating that the tube was designed for use on hills with no obstacles and adequate stopping room, and Ski Roundtop's safety training manual cautioning against putting obstacles in a tube's path. *Id.* at 42. The Bourgeoises note

that Di Nola's report concluded that Ski Roundtop's intentional decisions increased the risk of serious injury to its patrons, which support their claims for gross negligence and recklessness. *Id.* Accordingly, they maintain we should reverse the Superior Court.

In response, Ski Roundtop argues the Superior Court's opinion was consistent with Pennsylvania law. Ski Roundtop asserts that the duty of care was not before the trial court or Superior Court because duty is at issue only in negligence actions, and the trial court found the release barred the Bourgeoises' negligence claims. Ski Roundtop's Brief at 42. However, Ski Roundtop later argues the opposite, accusing the Bourgeoises of failing to appreciate that negligence is subsumed in a gross negligence or recklessness jury charge. *Id.* at 47. Ski Roundtop reads the Superior Court opinion as stating that expert testimony is often, but not always, required to establish a legal duty. *Id.* at 45. Ski Roundtop then faults the Bourgeoises for not arguing that an expert was not necessary to establish the standard of care, and instead submitting two expert reports, which Ski Roundtop views as waiving the issue of whether expert testimony is required. *Id.* Ski Roundtop maintains that the Superior Court was not analyzing the duty of care, but it was deciding whether the facts supported a jury charge for gross negligence or recklessness. *Id.* at 47.

Although Ski Roundtop's overarching position is that the duty of care is irrelevant, it notes that "the operator of a place of amusement for which admission is charged is not an insurer of its patrons." *Id.* at 48-49 (citing *Jones v. Three Rivers Mgmt. Corp.*, 394 A.2d 546 (Pa. 1978)). Instead, the operator is liable when it does not use reasonable care in light of "the character of the exhibitions given and the customary conduct of patrons invited." *Id.* at 49 (quoting *Jones*, 394 A.2d at 549). Regardless, Ski Roundtop concludes the Superior Court correctly affirmed the trial court order because the record did not support the Bourgeoises' claims for gross negligence or recklessness. *Id.*

Further, Ski Roundtop argues that the Bourgeoises' reliance on *Tayar* is misplaced. First, it emphasizes that this Court's decision in *Tayar* addressed only whether an exculpatory clause can release reckless conduct and did not discuss the merits of the standard for recklessness. *Id.* at 51-52. Thus, the Superior Court's holding in this case cannot conflict with this Court's holding in *Tayar*. Second, Ski Roundtop notes the Superior Court's decision in *Tayar* did not establish the duty of care a commercial snowtubing facility owes its patrons. *Id.* at 52-53. Because the Superior Court in this case found that gross negligence and recklessness require proof of a deviation from a standard of care, Ski Roundtop argues it does not conflict with the *Tayar* Court's decision. *Id.* at 53.

Additionally, Ski Roundtop argues neither the trial court nor the Superior Court required the Bourgeoises to identify a violation of industry standards. *Id.* at 58. Instead, according to Ski Roundtop, both courts concluded the record evidence did not meet the standard for gross negligence or recklessness. *Id.* at 57. Additionally, Ski Roundtop concedes the Bourgeoises' argument that compliance with industry standards does not shield a party from liability. *Id.* at 58. However, it dismisses that argument as irrelevant because "[i]t may be of merit in considering negligence, but it has no value in considering the findings of the lower courts in the instant matter." *Id.* at 58-59.

In their reply brief, the Bourgeoises point to specific passages in the trial court's and the Superior Court's opinions in which they faulted the experts for not articulating the industry standard for using deceleration mats in a run-out area. Bourgeoises' Reply Brief at 25. The Bourgeoises then reiterate that the existence of an industry standard is not necessary to prove claims of gross negligence or recklessness. *Id.* at 28.

**B. ANALYSIS**

The Superior Court *sua sponte* rejected the expert reports because the reports failed to set forth a duty or standard of care and failed to define the industry standard for the use of rubber mats as deceleration devices. We conclude this was error. The question of duty is a legal question for the court to decide. *See R.W. v. Manzek*, 888 A.2d 740, 746 (Pa. 2005) (explaining "[t]he existence of a duty is a question of law for the court to decide. . . . a duty consists of one party's obligation to conform to a particular standard of care for the protection of another.") (citations omitted). The Bourgeoises have consistently maintained that Ski Roundtop had a duty to exercise reasonable care to protect its patrons from dangerous conditions. *See* Complaint, 7/24/15, at ¶¶ 32-33 (averring Ski Roundtop had a "non-delegable duty to not disregard the safety of snow tube riders[,]" who were owed the highest duty of care as business invitees); Bourgeoises' Response to Mot. for Summary Judgment, 3/6/17, at ¶¶ 7, 34. Further, Ski Roundtop's conduct showed its recognition that it had a duty to bring its snow tubing patrons to a safe stop at the completion of the run. To fulfill this duty, Ski Roundtop chose to use deceleration mats in fast conditions. *See, e.g.*, Ski Roundtop's Answer & New Matter, 9/26/16, at ¶ 17 (stating it used deceleration mats "as an aid to slow riders down"); *Id.* at ¶ 22 (confirming it adjusted the mats "as necessary to address changing conditions"); Ski Roundtop's Safety Training Manual at 2, R. 423a (advising employees "[i]f it is a fast night, you may need to place deceleration mats down at the end of the lane to slow the tubers down."). This Court recently reaffirmed the principle that an actor whose affirmative conduct increases the risk of harm to others has a duty to "exercise reasonable care to protect them against an unreasonable risk of harm arising from that affirmative conduct." *Feleccia*, 215 A.3d at 15 (internal quotation marks omitted) (confirming RESTATEMENT (SECOND) OF TORTS § 323 is part of Pennsylvania law). In this case, Ski Roundtop

undertook a duty to stop its patrons in the run-out area before they could reach the mixing area. In so doing, it had a duty to exercise reasonable care to protect its patrons against unreasonable risks. *Id.*

The Superior Court, like the trial court, erred in failing to review the expert reports in the light most favorable to the Bourgeoises. Viewing the reports in such a light, a reasonable inference is that the experts viewed Ski Roundtop's duty as an obligation to bring its patrons to a safe stop and directed their analysis at how Ski Roundtop failed to protect its patrons against unreasonable risks and instead increased the risk of harm to its patrons through a number of conscious acts, including using folded deceleration mats in an inadequate run-out area under fast conditions.[8] Thus, inherent in the experts' opinions regarding the breach of the duty was a recognition that Ski Roundtop's duty was to protect its patrons from unreasonable risks in bringing their snow tubes to a controlled stop. Accordingly, we conclude the Superior Court erred in rejecting the Bourgeoises' experts on the basis that they did not establish a duty and standard of care.

Further, the Superior Court erred in *sua sponte* reviewing and assailing the expert reports on the ground they did not define an industry standard. Initially, viewing the expert reports in the light most favorable to the non-moving party's case, the Bourgeoises did not submit the expert reports to establish the standard of care; rather, the Bourgeoises submitted them to show Ski Roundtop breached its duty and to demonstrate the collision with the deceleration mat caused Mr. Bourgeois's injuries. For this reason, we disagree with the Superior Court's unsubstantiated conclusion that "the parties do not dispute that [the Bourgeoises] needed an expert opinion to establish a standard of care." *Bourgeois*, 2018 WL 3868670, at *4 n.3.

---

[8] Accordingly, we do not find merit in Ski Roundtop's argument that the Bourgeoises waived their argument that an expert was not required to establish the duty of care by submitting two expert reports that largely focused on breach and causation.

Instead of viewing the expert reports in the light most favorable to the Bourgeoises, the Superior Court disregarded the expert reports because they failed to define an industry standard for the placement of deceleration mats, which in the Superior Court's view was necessary to establish the standard of care. However, "[c]ompliance with the statute or regulation is admissible as evidence of the actor's exercise of due care, but such compliance 'does not prevent a finding of negligence where a reasonable [person] would take additional precautions.'" *Berkebile*, 281 A.2d at 710 (quoting RESTATEMENT (SECOND) OF TORTS § 288C); *see also* Ski Roundtop's Brief at 58 (recognizing an actor's compliance with industry standards does not absolve the actor of liability). As discussed above, Ski Roundtop's duty was not to comply with industry standards; its duty was to exercise reasonable care to protect its patrons against unreasonable risks that its conduct of using rubber mats to decelerate snow tubers created. Further, Di Nola's report referenced industry standards not to establish Ski Roundtop's duty, but to explain how Ski Roundtop breached its duty to exercise reasonable care in slowing down its snow tubing patrons at the end of their runs. Di Nola's Report, 3/15/17, at 40. The Superior Court specifically faulted Di Nola for concluding that Ski Roundtop's "decision to use deliberately deployed folded anti-fatigue rubber mats as a deceleration device constitutes an extreme departure from the ordinary standards of conduct for a tubing park operator" without defining the ordinary standards of conduct. *Bourgeois*, 2018 WL 3868670, at *5 (quoting Di Nola's Report, 3/15/17, at 40). However, Di Nola had 25 years of experience in performing accident investigation and risk management consultation in the ski industry, from which he gained specialized knowledge allowing him to opine about the ordinary standards of conduct for a tubing park operator. Any dispute over what those standards are goes to the weight and credibility of his testimony, which is not a proper consideration at the summary judgment stage as courts must view the evidence in a light most favorable

to the non-moving party; instead, it should be resolved by a factfinder at trial. *See Harris v. NGK N. Am., Inc.*, 19 A.3d 1053, 1067 (Pa. Super. 2011). Further, even if we set aside Di Nola's conclusion that Ski Roundtop did not comply with the ordinary standards of conduct for a tubing park operator, his report contains numerous other conclusions as to how Ski Roundtop breached its duty of care in a grossly negligent or reckless manner in that it knew or should have known that its intentional acts increased the risk of substantial harm to its patrons. *See* Di Nola's Report, 3/15/17, at 38-41.

The Superior Court outright dismissed Moskowitz's report because it did not set forth any standard of care for tubing operators. However, Moskowitz's report contained a detailed analysis of folded deceleration mats and concluded that Ski Roundtop should have known a folded deceleration mat would have brought its patrons to an abrupt stop, increasing their risk of serious injury, which is exactly what happened when Mr. Bourgeois's snow tube hit a folded mat. This raises a genuine issue of material fact as to Ski Roundtop's constructive knowledge, *i.e.*, Ski Roundtop should have known—by conducting a similar study of the stopping power of folded mats—of the increased risk of harm created by its decision to use folded mats as deceleration devices. Accordingly, the Superior Court erred in assailing the experts' conclusions on the basis that they did not establish a standard of care and failing to view the experts' conclusions in a light most favorable to the Bourgeoises.

For these reasons, we conclude the Superior Court erred in affirming the trial court order granting summary judgment. Accordingly, we reverse the Superior Court's order and remand for further proceedings.

Chief Justice Saylor and Justices Baer, Todd, Donohue, Dougherty and Wecht join the opinion.